PHILIP GRASSO, Administrator, etc., of JOHN GRASSO, Deceased, Claimant, *v.* THE STATE OF NEW YORK, Defendant. (Claim No. 25615.)

Court of Claims, November 28, 1941.

*Samuel L. Greenberg*, for the claimant.

*John J. Bennett, Jr., Attorney-General* [*Joseph L. Delaney, Assistant Attorney-General*, of counsel], for the defendant.

FITZSIMMONS, J. Claimant's son, John Grasso, twenty-eight-year old inmate of Woodbourne Institution for Defective Delinquents, died March 26, 1939, as a result of injuries sustained the previous day, while in the performance of assigned duties at the institution. Claimant, as administrator of his son's estate, seeks damages against the State by reason of its alleged negligence in compelling his son, a sub-normal person, to work in dangerous surroundings.

The immediate cause of death was an embolism resulting from fractures of the tibia and fibula of the young man's left leg. The fractures were caused by decedent's left leg having been struck

by a bouncing stone, which, loosened by thawing conditions, had rolled down from a point two-thirds up the side of a nearby twenty-five-foot embankment and struck and bounced off a stone in its course, with force sufficient to throw him to the ground. The embankment furnished the rocks on which inmates worked on the level ground nearby. Thawing conditions had prevailed for the five days previous to and on the day of the accident; maximum temperature on March twenty-third was forty-five degrees; on the twenty-fourth, sixty-one degrees and on the day of the accident, seventy degrees. Guard Bertram Smith, under whose direction the men were working, called a warning to decedent and his team-mate. The warning, though given within their hearing distance, went unheeded.

The reason for decedent's failure to respond to the warning, while unknown, may fairly be read from his mental condition as well as the circumstances surrounding his injury.

Decedent's mental ailment, known as mental deficiency, gave him a mental age of six years and four months and an I. Q. of forty-two, which is entirely different in a mentally defective adult from that of a child of six years and four months.

The unheeded warning obviously may be traced to the inability of the young man to grasp and promptly react to a sudden, speedy impending danger, which by reason of the almost imperceptible time elapsing between the stone's loosening and its striking him, might well have confused the judgment of a person in sound mental and physical health.

No person was stationed on the embankment to observe and warn of possible dangerous conditions nor were means provided to obviate such dangers — except through the guard, who, in addition to having charge of the twelve inmates, directed them in their work, a large task in view of the dangerous conditions prevailing.

The State, in view of its five days' warning of possible danger through thawing conditions, and of its knowledge — or at least sufficient lapse of time to have served as notice — of a dangerous condition, should have provided means either of removing stones likely to have rolled down the embankment or to have kept the inmates sufficiently distant from the foot of the embankment to have safeguarded them from possible injury.

It seems clear, therefore, that the State was negligent and decedent free of contributory negligence.

Under conditions entitling claimant to a recovery, it is unfortunate that no pecuniary damage was sustained; at least none was proved.

The court, in seeking to determine damages sustained, is mindful

that in a claim of this kind proof must necessarily be indefinite, prospective and contingent, and likewise, that such proof should establish a fair basis of fact including age, sex, health and intelligence of the decedent, together with the situation and condition of the survivors, their relationship to him and decedent's prior record of earnings and assistance, to which our attention is drawn by *Houghkirk* v. *President, etc., D. & H. C. Co.* (92 N. Y. 219) and *Birkett* v. *Knickerbocker Ice Co.* (110 id. 504, 508). The court, too, has considered " in a reasonable way those prospective and indefinite damages arising  *  *  *  in addition to actual money damages  *  *  * " as recited in *Countryman* v. *Fonda, J. & G. R. R. Co.* (166 N. Y. 201, 209, 210), yet despite the numerous possible yardsticks to which resort may be had, no measure of damage appears available, actual, prospective or indefinite.

No proof of actual damage having been offered, even of funeral expense, resort must be had to " prospective and indefinite damages."

An examination of decedent's past record held out no reasonable hope to those who might naturally look to him for assistance — financial or otherwise.

The only medical and mental testimony offered by claimant was that of Dr. Vernon Branham, superintendent of the institution, psychiatrist and physician to the inmates, as well as a member of its parole board.

In Dr. Branham's opinion based upon personal observation of the young man and examination of his case history, decedent was not, and could not be, parole material; that is, recover sufficiently to warrant belief that he could take his proper place in the affairs of life. The doctor added that the decedent was not insane; that his ailment arose from an hereditary lack of gray matter; that the brain had not developed to its full extent, and that it does not develop after a certain age. The doctor further stated that he would describe the decedent's mentality *as a low intelligence level, that such condition was permanent* and that there had been no improvement in decedent's mentality from the time he was first committed to Napanoch in 1934 up to the time of the accident in 1939.

The question put to the doctor: " In other words, doctor, would he [decedent] have improved to a point where you might have changed your opinion? " was answered, " My experience in these cases leads me to believe that there was not." Claimant's attorney then asked, " Was there any possibility? " to which the answer was given, " I don't think so. I am giving you my opinion."

Except to reach into the field of conjecture, it seems clear that John Grasso, had he lived his normal span of years, would always have been a ward of the State.

Examining the record along the border lines of conjecture, we must consider further testimony based on a few questions submitted to and answered by Dr. Branham.

A few inmates of the mental intelligence of John Grasso have left the institution; the mental age does not always indicate the adaptability of an individual; two such may have different powers and capacities of adjusting themselves socially; in some cases outside supervision is better; sometimes it is possible to find the type of job to which a man of that kind can adjust himself; for example, be returned to a rural community for farm work, but he could not find a job in New York city because he could not meet that level of intelligence, *but if offered a job in New York city and it was felt that it was a bona fide job* — " I think it might have altered it " (" it " indicating parole attitude).

Examination of the record alone might well lead to the impression that, under certain favorable conditions, John Grasso might have improved to such an extent that he would have been capable of working on a farm, or even of winning parole to accept an offer of a *bona fide* job in New York city. The attitude and demeanor of the witness, *in combination with his words*, clearly leave the impression that the young man's mental deficiency was of a permanent nature, and that his low level of intelligence offered no prospects of its ever warranting the granting of a parole. Furthermore, Dr. Branham was discussing generally the situation as regards inmates; he had already made clear his views concerning John Grasso.

Assuming that Dr. Branham had in mind circumstances under which decedent might have won parole and obtained a job, we now turn to the young man's past record of earnings and assistance to members of his family.

Through claimant's testimony and official records introduced in evidence we find that decedent attended public school in New York city from the age of five years and four months to the age of ten years and three months, and that he progressed up to the sixth grade; while he was no disciplinary problem to his teachers, his deportment always having been good, he was very dull and was absent a great many half-days — absences which looked like truancies — and had trouble in learning, his class work not having been good.

On January 27, 1922, decedent was confined to Children's Hospital, Randall's Island, from which he was transferred to Syracuse

State Hospital on July 24, 1922. He was paroled in 1928. On April 27, 1930, the young man was committed to New York City Reformatory, having been found guilty of petit larceny, from which institution he was paroled November 25, 1930. He was subsequently committed to the Institution for Male Defective Delinquents on February 14, 1934.

Decedent's institutional record was good from the standpoint of deportment; he readily submitted to efforts made to further his education, but did not, or could not, mentally respond.

The young man had never worked for any person other than his father, who was engaged in the excavation business. The total time of such work over the young man's life had been six years. The work was that of driving a horse, for which decedent was paid the prevailing rate, fifteen dollars per week. Claimant testified that the boy spent his pay " to buy clothes and things." It also appears that claimant gave his son the money with which to buy the " clothes and the rest." The boy paid no board.

Claimant's attorney cites for the court's consideration the case of *Liubowsky* v. *State of New York* (Court of Claims, Claim No. 25491, not reported). In that matter the award of this court was increased upon appeal to the Appellate Division, Third Department (260 App. Div. 416), and subsequently sustained by the Court of Appeals (285 N. Y. 701).

Presiding Judge BARRETT, speaking for this court, stated that due to contradictory testimony concerning the death through negligence of the State of an inmate of a State institution, who left him surviving a widow and two minor children, " it cannot be said that he *would have recovered*, but there was a *possibility of recovery*, and that must be considered. There was no certainty that he would ever have been able to resume his work and his business, but there is the possibility that he would have been able to do so. Damages which might be awarded if the decedent were healthy and of sound mind, cannot be given."

In the present claim there is no such possibility of recovery. The decedent was described as permanently of a low level of intelligence, so low a level. as to place him beyond meriting a parole had he lived. There was no contradictory testimony; this was offered by the claimant's only medical witness.

Again, had he lived, his past record of earnings and of assistance is such as to indicate that he would never have been of assistance to his family. His earnings were used by decedent entirely for his own benefit; he not only contributed nothing, he never even paid his own board. His capacity was such that his earnings of necessity must have remained on a low level. From the record

it appears that such a basis was insufficient even for decedent's own needs, if meeting his financial responsibility was to be considered.

Except to delve into the realm of speculation, decedent would never have earned parole. Had the apparent impossibility come to pass, he would have been of no assistance to his family, as the record is silent as to it, if any.

Decision is made in accordance herewith.