LAWRENCE HAWLEY, by His Mother, CAROLINE A. THOMAS, as Guardian ad Litem, Respondent, v. STATE OF NEW YORK, Appellant. (Claim No. 39502.)

Fourth Department, January 14, 1965.

*Louis J. Lefkowitz, Attorney-General (Jeremiah Jochnowitz and Paxton Blair of counsel), for appellant.*

*Leonard H. Amdursky and Morris B. Swartz for respandent.*

BASTOW, J. Claimant, a man of mature years but a mental defective, represented by his guardian ad litem, has received a substantial monetary award based upon a finding that the State was liable for the negligent acts of one Robert Thompson, to whom a State school had committed the custodial care of claimant. The latter in September, 1959 received serious permanent injuries, while working as a farm hand for Thompson, when he fell some 40 feet from the top of a scaffold erected on the outside of a silo.

The custodial contract had been made with Robert Thompson, who was not present at the time of the accident, but his father, Harold Thompson, was there and directing the operation. While there was no formal proof of a partnership it could be found that the farm was operated as a joint venture. The father owned the farm and the son testified—"I more or less run it. If there is money left over * * * he gets all of it." It further could be found from the testimony of the son that with his authorization the father had come to the farm to refill the silo. It follows that the father and son, as joint adventurers, would be liable to claimant for a wrongful act committed in conducting the joint enterprise (48 C. J. S., Joint Adventures, § 14, subd. e, p. 870). In any event there is clear proof that at the time of the accident the father was acting as an authorized agent for his son.

All members of the court agree that there is ample proof of the negligence of the Thompsons and freedom from contributory negligence on the part of claimant. The area of disagreement centers upon the degree of care imposed upon the State in the light of the relationship among the State, Robert Thompson, and claimant.

In 1947 when claimant was 13 years old he was committed as a mental defective to a State school. He reached his educational peak at the third grade level. He was first placed on convalescent status in 1952 on a farm with one Banks. Although then 18 years of age he had a mental age (according to the records of the school) of 9 years and an I. Q. of 61.

The order of commitment adjudged claimant mentally defective and certified him to the school—"an institution for the custody and treatment of the mentally defective". A mental defective is one who is not mentally ill but who is "incapable of managing himself and his affairs [and] who for his own welfare or the welfare of others or of the community requires supervision, control or care" (Mental Hygiene Law, § 2, subd. 9). After commitment to his custody, the director of the institution may keep a patient at the institution, assign him to family care, place him on convalescent status, or discharge him.

If assigned to family care, the patient is boarded with a family in the community at the expense of the institution. A mental defective so placed continues to remain a patient of the institution until discharged therefrom (Mental Hygiene Law, § 34, subd. 12).

Convalescent status (Mental Hygiene Law, § 132 — since 1963 denominated "Community status") had its origin in the parole

concept. (Cf. Mental Deficiency Laws of 1919, ch. 633, § 38.) Briefly stated, patients released in that status free the institution from liability for support and place it upon the person in whom custody is placed. But the transfer of "custody" would appear to be more a physical than a legal act. The new custodian must report the physical, moral, and mental condition of the patient to the institution, the patient must be accessible to representatives of the institution, and upon satisfactory evidence the status may be terminated by the director and the patient returned to the institution. Thus, complete legal control of the patient remains with the State.

In passing it should be said that all members of the court see a clear distinction between family care and convalescent status. Family care is an intermediate step between confinement in the institution and release on convalescent status and those so cared for, as heretofore stated, continue as patients of the institution. Therefore, we all agree that *Hendler* v. *State of New York* (33 Misc 2d 171) relied on by the trial court, is distinguishable from the case before us.

We are met at the threshold by the decision in *Excelsior Ins. Co.* v. *State of New York* (296 N. Y. 40). There a mental defective, who had "eloped" from a State school caused fire damage. Claimants (the owner of the property and his subrogees) were denied recovery from the State upon the ground, among others, that the supervision and treatment of the inmate by the school authorities were proper and reasonable under the circumstances. There the court, as it stated, was confronted with striking a balance between the duty of the State to care for its mentally defective wards and the concern of the State that the inmates of its institutions should cause no injury or damage to the property of those in the vicinity.

But here we are considering the duty of the State to the undischarged inmate. The distinction was recognized in the *Excelsior* decision (*supra*) where it was written (p. 44): "Toward the inmate Flood, the State had a 'quasi-parental power'—bound, Sir Frederick Pollock has observed, to use more diligence in informing itself what treatment was proper for him than a parent would be bound to use. (Pollock on Law of Torts [new American ed., 1894], pp. 150–151.)" We recognize the necessity of again (as suggested in *Excelsior*, p. 46) striking a balance between keeping mental defectives in close confinement and under constant surveillance or the modern concept "of allowing the moron a freedom of action without close and continual watching". But in permitting such freedom of action the State in its quasi-parental relationship owes to the

inmate the duty of exercising reasonable care that he shall not be exposed to unnecessary dangers.

We briefly describe the accident herein. The Thompsons were attempting to complete the filling of a silo. It was necessary to raise a pipe weighing some 200 pounds from the ground to the top of the silo. Claimant was directed to ascend the outside of the silo to a platform some 40 feet above the ground. The platform was 3 feet square and had no railings. The only handhold was the next highest ring on the silo. Claimant was on the platform some five minutes while the pipe was being raised from the ground. It appears claimant was given no instructions as to the part he was to play in the operation as Harold Thompson testified that " he (claimant) knew what he was supposed to do ". But apparently he did not know what he was supposed to do. Actually claimant was supposed to guide the pipe as it moved upward and keep it a few inches from the exterior of the silo until it was in place. Instead, claimant grasped the pipe and was attempting to pull it upward when he fell from the unguarded platform.

" Jurisdiction is inherent in the state over unfortunate persons within its limits who are idiots or have been deprived of the use of their mental faculties. It is its duty to protect the community from the acts of those persons who are not under the guidance of reason, and also to protect them, their persons and property from their own disordered and insane acts." (*Sporza* v. *German Savs. Bank*, 192 N. Y. 8, 14.) Thus, it has been frequently held that the State owes the mental defectives and insane persons committed to its care the duty of protecting them against the negligence of its own employees and agents and of protecting them against self-inflicted harm. (*Martindale* v. *State of New York*, 269 N. Y. 554; *Gioia* v. *State of New York*, 22 A. D. 2d 181; *Minotti* v. *State of New York*, 18 A. D. 2d 769; *Grasso* v. *State of New York*, 177 Misc. 690, affd. 264 App. Div. 745, affd. 289 N. Y. 552.) Moreover, the State's liability for the torts of its agents extends to employees of a private institution to whose custody the State has committed its inmate (*Paige* v. *State of New York*, 269 N. Y. 352).

The issue here presented is whether the State upon making a contract with another for custodial care of a mental defective is thereby relieved from further liability even though the negligent act of the contract custodian involves subjecting the patient to a situation where it can be said that his mental defect renders him incapable of protecting himself from harm or if in this narrow area the negligence of the custodian occurs in his capacity as agent of the State with resulting liability of the

latter. We recognize that a strong argument may be made that the imposition of such liability upon the State might well tempt the latter "to revert to the outmoded and disadvantageous system of confining the mental defective". (*Excelsior Ins. Co.* v. *State of New York, supra,* p. 46.) But a contrary holding might equally tempt the State to enter into custodial care agreements unmindful of its duty to protect these unfortunates from injury caused by the negligence of the selected agent of the State and the mental incapacity of the patient.

It is no new concept that liability may be imposed upon the State for a negligent act performed by a third party acting as its agent (cf. *Maltby* v. *County of Westchester,* 267 N. Y. 375). (See, also, *Pantess* v. *Saratoga Springs Auth.,* 255 App. Div. 426.) The duty imposed upon the State was one from which it could not be freed short of absolute discharge of the patient. The negligence of its selected agent (with minimal supervision on the part of the State) in placing claimant in a position of peril with resulting injury to him was imputable to appellant.

The judgment should be affirmed.

WILLIAMS, P. J. (dissenting). The claimant Hawley was injured when he fell from a silo while working on a farm privately owned by one Thompson. The liability of the State is predicated upon the fact that claimant, who was an adjudicated incompetent, committed to the Syracuse State School, was employed on the farm while released from the institution on convalescent status (now community status). (See Mental Hygiene Law, § 132.) The award of the Court of Claims is founded upon a determination that an agency was established between the State and the farmer employer which rendered the State liable for the farmer's acts of negligence toward the claimant.

We agree that the evidence is sufficient to support a finding that the accident resulted solely from the negligence of the employer. We do not agree, however, that liability for this negligence may be imputed to the State and without such an imputation there is no basis in the record for a finding of liability on the part of the State. No contemplated agency may be found from an examination of the relevant statutes. Therefore, if an agency was created it was by implication of general law and we find nothing to support this latter theory.

There is ample proof that Hawley was a fit subject for convalescent status. While he was of low mentality, he was not insane. Indeed, three years prior to the accident he had been recommended for discharge but, because his then employer was

in arrears in the payment of his wages, his discharge was postponed to facilitate collection for him of the arrearage. At the time of the accident Hawley had been on convalescent status for seven years and his record indicates generally that he was a competent farm worker. Further, there is nothing to suggest that the State was negligent in the placement of Hawley with Thompson or that the State was derelict in its general supervision of Hawley while on convalescent care with Thompson.

Section 132 of the Mental Hygiene Law, as in effect during the entire period of employment by Thompson, authorized the director of an institution for the care and treatment of mental defectives to grant convalescent status to a patient and thus permit him to leave the institution in the custody of a parent, relative, legal guardian, or other person. It was required that the patient be kept accessible to the representatives of the institution and the director was empowered to require his return at any time. Further, the person to whom the patient was entrusted, if required by the director, was mandated to report on the physical, moral and mental condition of the patient. Thus, it appears that the statute, in keeping with its rehabilitative purposes, contemplated that a patient who was not in need of institutional supervision would be afforded an opportunity to live as normal a life as permitted by his mental condition. Implicit in this was the expectation that the patient would enjoy freedom from institutional regulation commensurate with his demonstrated capacity. It was pursuant to this statute and its contemplated benefits that claimant was placed in the employment of Thompson.

Furthermore, it was specifically provided that the institution which released the patient should not be liable for his support during the period of his convalescent status. Under the statute such liability rested with the person in whose custody the patient was released. It is appropriate to note also that the convalescent care program is a development from the parole concept and that the initial statutory enactment provided that: ''The institution paroling a patient shall not be liable in any manner whatsoever for such patient while on parole.'' (L. 1919, ch. 633, § 38.) In 1936 this provision was repealed and in its place there was added a provision that: '' The institution paroling a patient shall not be liable for his support while on parole.'' (L. 1936, ch. 563, § 16.) The change in language came about as part of a general revision of the Mental Hygiene Law and we ascribe no special significance to it. We have found nothing to indicate that the Legislature intended to broaden the liability of the State by this change in language.

A portion of the opinion in *Excelsior Ins. Co.* v. *State of New York* (296 N. Y. 40) is applicable and pertinent. We quote from page 46: "Decision herein has a significance which transcends the issue of whether or not a money recovery should be allowed. In time gone by, mental defectives were confined and kept under constant surveillance. Medical and psychiatric advances, demonstrating the inadvisability of that system, prompted the State to abandon it and adopt the modern and therapeutically approved method of allowing the moron a freedom of action without close and continual watching. To hold the State liable in a case such as the present may have an inimical and retarding effect on the treatment of mental defectives. The State, faced with accepting responsibility as an insurer of any damage the moron might cause, may well be tempted to depart from its salutary procedure, may well be influenced to revert to the outmoded and disadvantageous system of confining the mental defective, of keeping him under constant surveillance, while he is being trained to make those social adjustments essential to independent and successful living." Imputation of liability in the present case would be repugnant to the philosophy of rehabilitation expressed above. This accident could not have been averted by the State by any means short of "constant surveillance" or the imposition of such restrictions upon the patient's activities as to deter employment and thus impair the benefits and defeat the purposes of the convalescent care program. Affirmance of the award might well lead to a reconsideration and reappraisal of this valuable and productive social program.

In granting Hawley convalescent status the director of the Syracuse State School entered into a contract with the farmer employer. In that contract it was clearly set forth that Hawley was a patient on convalescent status and Thompson undertook "to supervise him at all times." He further agreed to care for his material needs, pay a monthly salary to the school for Hawley's benefit, notify the director of any serious illness or abnormality of conduct, report to the director regarding his conduct and general condition and provide social security and workmen's compensation insurance for his benefit. The provision for workmen's compensation insurance was tantamount to a recognition of the fact that in the event of an accident in the course of his employment Hawley would be required to look to his employer alone for compensation. This demonstrates clearly that at the time the contract was entered into the State and Thompson had no intention of creating an agency which would bind the State. Their concern was with providing financial protection for the claimant in the event of injury. This is

entirely inconsistent with any theory that Hawley would have a claim against the State for Thompson's negligence as distinguished from a claim against Thompson's compensation insurance carrier. While it appears that the State may have been somewhat remiss in not enforcing the requirement that the farmer provide workmen's compensation insurance, there was no causal relationship between this failure and the claims of negligence which are before us. The present claim is based purely and solely on imputable negligence, and does not purport to be based upon the State's failure to enforce the contractual obligation of the farmer employer. Moreover, if this action stemmed from the breach of this portion of the agreement the amount of the award would have to be computed in a completely different manner than was employed by the Court of Claims Judge.

We agree with the majority that *Hendler* v. *State of New York* (33 Misc 2d 171) upon which the Court of Claims Judge relied with the statement that: "This case cannot be distinguished from *Hendler* v. *State of New York* (33 Misc 2d 171), in which an award was made to claimant" is readily distinguishable.

We have said that the record indicates that Hawley was a trained and competent farm worker who had given satisfactory service for several years. It was clearly in the interest of his rehabilitation that he was assigned to Thompson's farm. The statement of the Court of Claims Judge (p. 276) that "It was known that he could perform only simple chores under close supervision" is not supported by the evidence. Hawley was considered by the school to be a capable and trained farm helper whose mental problems were social in nature. Under these circumstances the State's responsibility to him was limited to keeping informed as to the progress of his rehabilitation and recalling him in the event of an unfavorable change in his condition or his environment. To impose liability under these circumstances would in effect make the State an insurer of the acts of the farmer, an independent employer.

The judgment should be reversed and the claim dismissed.

HENRY and NOONAN, JJ., concur with BASTOW, J.; WILLIAMS, P. J., dissents in opinion in which DEL VECCHIO, J., concurs.

Judgment affirmed, with costs.