CORNELIUS HARRIS, as Guardian of ADRIENNE D., et al., Respondents, v STATE OF NEW YORK, Appellant.

Second Department, May 27, 1986

APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General (Peter J. Dooley* and *Vernon Stuart* of counsel), for appellant.

*Barry, McTiernan & Moore (Roger P. McTiernan, Sr.,* and *Kathryn Deborah Nealon* of counsel), for respondents.

## OPINION OF THE COURT

KUNZEMAN, J.

The issue presented by these appeals is whether the State may be held directly liable for injuries sustained by Adrienne D., a mentally disabled individual, while a resident of a State-certified family care home in which she had been placed by the State pursuant to Mental Hygiene Law article 31. Her injuries were sustained when she suffered an epileptic seizure in a locked bathroom in the home. Under the circumstances of this case, we conclude that direct liability was properly imposed upon the State and thus, affirm the modified judgment of the Court of Claims.

In 1971, Adrienne, a mildly retarded individual, was admitted to the Wassaic Developmental Center, a State institution for the mentally retarded. At the time of her admission, she was 16 years of age, and had a known history of epileptic seizures which rendered her immobile for minutes at a time. Her medication, Dilantin, kept her epileptic condition under control although she did continue to experience some seizures following her admission.

In 1974, Adrienne was placed in a family care home under the supervision of William and Mary McNair. At the time of the placement, Mrs. McNair was informed by social workers that Adrienne was an epileptic, but was never given any records regarding her condition. Mrs. McNair was told that Adrienne was to take her medication three times a day. Between the years 1974 and 1978, Adrienne suffered periodic seizures while under the McNairs' supervision.

The McNair residence had been certified by the State as a family care home following an inspection in or about 1975. A recertification was made in 1977. During the certification inspections, as well as intermittent other inspections, no hazardous conditions were found to exist in the home. The second-floor bathroom, where the underlying incident occurred, was outfitted with a bathtub, commode, sink and closet. The bathtub, which was enclosed by sliding glass doors, was equipped with a showerhead and faucet with one control for the hot and cold water. The door to the bathroom was a solid, standard, wood type with a butterfly lock below the handle on the inside of the bathroom. There was no turning device for the lock on the outside of the door. The McNairs were never directed to remove or change the lock on the bathroom door.

On April 7, 1978, at approximately 7:00 P.M., Adrienne went to take a bath in the upstairs bathroom. Although she had not been told to do so, she locked the bathroom door. She stepped into the bathtub, turned on the hot water, and then suffered an epileptic seizure which rendered her immobile. At approximately 7:15 P.M., Mrs. McNair became aware of the problem when another mentally retarded client residing in the home summoned her. Upon arriving at the bathroom, Mrs. McNair discovered the door locked. By looking underneath the door, Mrs. McNair was able to observe Adrienne standing in the corner of the tub, with her back against the wall and away from the shower spout. The bathroom door was eventually forced open and the claimant was transported to the hospital. Adrienne was diagnosed as having suffered first, second and third degree burns on her lower legs and ankles.

The instant claim against the State was commenced in 1980, seeking to recover $5,000,000 for personal injuries, $750,000 on a derivative claim and $10,000,000 in punitive damages. Following a trial, the Court of Claims found, in the first instance, that the State had the primary responsibility for Adrienne's care and safety and as such was required to insure that any potentially unsafe condition which might exist in the subject family care home be remedied. The court also determined that the McNairs were agents of the State and, therefore, negligence on their part was imputable to it. Based on the facts as adduced at the trial, particularly Adrienne's known history of epileptic seizures, the court concluded that the State was negligent in permitting the McNairs to have a bathroom door in their family care home equipped with a lock

which could not be opened from the outside. Such negligence was further found to have been a proximate cause of the injuries suffered since, as a result thereof, Adrienne was exposed for several minutes to water of such a temperature that it resulted in severe burns. Adrienne was awarded $125,000 as full compensation for her injuries. The derivative claim and the demand for punitive damages were dismissed.

Before discussing the issue of the State's direct negligence in this case, we note that a question arises as to whether the Court of Claims determination that the McNairs' negligence could be imputed to the State was proper. Mental Hygiene Law article 31 and the regulations promulgated thereunder provide for the placement of mentally disabled persons in State certified family care homes. Such facilities are defined as "the combination of a private residence and a family certified by the commissioner according to regulations stated elsewhere in this part to provide care for no more than 10 mentally disabled persons" (14 NYCRR 87.1 [a]). A family care provider is "a person or persons to whom an operating certificate has been issued by the commissioner to operate a family care home" (14 NYCRR 87.1 [b]). Placement in a family care home acts as a conditional release which terminates the State patient's inpatient status and sets up an arrangement of outpatient care and treatment (14 NYCRR 36.2 [b]).

In considering the issue of whether the State could be vicariously liable for the negligence of a family home care provider, the case of *Hawley v State of New York* (22 AD2d 357, *revd* 16 NY2d 809) is instructive. That case involved a mentally disabled individual who had been committed to a State institutional school. During the claimant's confinement, the school entered into a custodial contract with a nearby farmer, allowing the claimant to work on the farm on "convalescent status" *(Hawley v State of New York, supra,* at p 358). While working on the farm, the claimant sustained physical injuries when he fell 40 feet from the top of a scaffold erected on the outside of a silo. The trial court in *Hawley* found the State vicariously liable for the claimant's injuries. The Fourth Department affirmed, stating, in relevant part *(Hawley v State of New York, supra,* at p 361): "It is no new concept that liability may be imposed upon the State for a negligent act performed by a third party acting as its agent (cf. *Maltby* v. *County of Westchester,* 267 N.Y. 375). (See also, *Pantess* v. *Saratoga Springs Auth.,* 255 App. Div. 426). The duty imposed upon the State was one from which it could not be freed short

of absolute discharge of the patient. The negligence of its selected agent (with minimal supervision on the part of the State) in placing claimant in a position of peril with resulting injury to him was imputable to appellant".

The Court of Appeals reversed the judgment against the State with the following memorandum *(Hawley v State of New York,* 16 NY2d 809, 809-810, *supra):* "The statutory relation between the State and the custodian of a patient on 'convalescent status' does not impose a liability on the State for an act of negligence of the custodian not foreseeable by the State in the exercise of reasonable care; and the custodian is not the agent of the State in this relationship so as to impute such a liability to the State when due care is taken in the selection of the custodian (Mental Hygiene Law, former § 132; § 34, subd. 12). It seems implied in subdivision 12 that a patient on convalescent status is not a patient at the institution. The custodian of such a patient is often his family or guardian (§ 132) and no statutory distinction as to the relationship of 'agent' to the State is made between a member of the family and another suitable person selected as custodian. Reports must in either case be made to the State as to the physical, moral and mental condition of the patient, but the control of the patient is sufficiently independent from the State in detail and management as to protect the State against liability for acts of negligence not reasonably to be anticipated".

This court in *Blanca C. v County of Nassau* (103 AD2d 524, *affd* 65 NY2d 712) extended the holding set forth in *Hawley v State of New York (supra)* by refusing to impose vicarious liability upon the County of Nassau, absent statutory or case law precedent, for the acts of foster parents who are essentially contract service providers *(see also, Matter of Mavis M.,* 110 Misc 2d 297, 308; *cf. People ex rel. Ninesling v Nassau County Dept. of Social Servs.,* 46 NY2d 382, 389-390).

We are of the opinion that the rationale of *Blanca C. v County of Nassau (supra),* a foster care case, and *Hawley v State of New York (supra),* a mental health custodian case, is applicable to family home care providers as well since, in this case, a private person directly involved in the care of the State's client is also essentially a contract service provider. We therefore, agree with the State's argument that negligence on the part of the McNairs, as contract service providers, is not imputable to the State so as to render it vicariously liable when due care has been taken in the selection of such contract service provider.

This holding, however, does not mandate that the Court of Claims modified judgment be reversed and the claim dismissed. If the record supports a finding that the State was independently and directly negligent vis-à-vis the claimant, the additional holding in the Court of Claims decision imputing the McNairs' negligence to the State is mere surplusage which would not nullify the ultimate judgment in favor of the claimant. Having eliminated the State's alleged derivative responsibility for possible negligence of the contract service providers *(see, Hawley v State of New York, supra; Blanca C. v County of Nassau, supra)*, it must, therefore, be determined whether the State can be found to be an independent tortfeasor based upon direct negligence on its part under the specific facts of this case.

The State is not an insurer against any and all injuries suffered by mentally disabled patients in its care *(see, Excelsior Ins. Co. v State of New York*, 296 NY 40, 45). As was stated in *Killeen v State of New York* (104 AD2d 586, 587, *revd on other grounds* 66 NY2d 850) with respect thereto: "To hold the State liable in all cases would be inimical to the State's ability, incentive and possibilities for the treatment of the mentally retarded *(Excelsior Ins. Co. v State of New York, supra*, p 46), and, indeed, deference is to be paid to professional medical judgment with regard to the course of treatment (see *Seavy v State of New York*, 21 AD2d 445, affd 17 NY2d 675)".

It is well settled, however, that the State is under a duty to exercise reasonable care in protecting such patients so as to prevent their being injured *(see, Killeen v State of New York, supra; Comiskey v State of New York*, 71 AD2d 699). It was stated in *Mulberg v State of New York* (35 AD2d 856, *affd* 29 NY2d 916) that: "The cause of injury, however, must be one that the State could reasonably foresee before liability attaches *(Flaherty* v. *State of New York*, 296 N.Y. 342; *Di Fiore* v. *State of New York*, 275 App. Div. 885.) * * * The degree of reasonable care is measured by the physical and mental infirmities of the patients as the hospital officials and employees know them. *(Scolavino* v. *State of New York*, 187 Misc. 253, 261, *mod.* 271 App. Div. 618, *affd.* 297 N.Y. 460.)" A claimant, in order to establish the negligence of the State, must show that it was reasonably foreseeable that an injury could occur but need not demonstrate that the precise or exact manner in which the accident occurred was foreseeable or could be anticipated *(see, Derdiarian v Felix Contr. Corp.*, 51

NY2d 308, 315, 316-317). In the instant case, the resolution of this issue requires a study of the State's policies and programs with respect to mentally disabled persons such as Adrienne.

Over the years there has been an acceleration in the community placement programs, such as family care homes, so that the State's patients could live in smaller, less regimented, home-like environments in a local community. Such programs came about due to the exposure and subsequent furor surrounding the deplorable conditions existing at Willowbrook Developmental Center in 1977. The overpopulation therein, with the resultant problems, caused a major rethinking of and radical changes in the methods of treatment to be afforded at State's facilities, including Wassaic Developmental Center.

In addition to reducing the populations of such facilities, a major goal and concern was the creation of safer, more normalized environments and life-styles for the patients. Indeed, 14 NYCRR 87.8 (d), in setting forth the duties and responsibilities of family care providers, states, in particular, that they shall "(1) provide a home-like, family living environment * * * (iii) The family-care provider must ensure a resident's right to reasonable privacy". The whole thrust of the normalization theory was to embark on programs providing new and stimulating experiences so as to allow the patients to develop beyond a mere simple existence.

As this normalization process was the primary basis of the family care home program in which claimant was a participant, she was encouraged to be more responsible for herself in daily living in an attempt to normalize her life. To assist her in this endeavor, a clinical staff, under the supervision of a treatment team leader, was assigned to follow her progress as a family care home patient. Such teams followed up on the clinical aspects of an individual's treatment plan developed at the time of release. A major part of such treatment, as with the entire normalization program, was the encouragement of feelings of independence and self-sufficiency in the individual clients. The purpose of the team was to insure that the specialized needs of a patient were being met, and that a healthy, ideally normalized environment was being provided.

The State was aware that such environments, with more freedom and privacy, entailed greater risks for its family care home patients, as opposed to other patients in more restrictive programs. Of particular import is the fact that, while rules applicable to community residences or multiple dwellings

require bathroom door locks to be operable from the outside to facilitate opening in the event of an emergency, such a requirement did not apply to the home care program. The general expressed objective of the State was that such environments were to be normal and homelike rather than danger-free for the general home care patient. As a general rule, such objectives may be deemed laudable and appropriate. Unfortunately, Adrienne was subject to the unique problem of a seizure disorder, which fact was well known by her team leader, members of the team and the McNairs prior to April 1978.

In our opinion, it was readily foreseeable by the State that a patient such as Adrienne, known to suffer from epileptic seizures which render her immobile for many minutes, was subject to additional jeopardy when behind a locked door with no emergency means of access. Not only could the general risks of scalding be reasonably perceived due to nonaccess but, also, the possibilities of slipping, falling, injuring herself or drowning *(see, Derdiarian v Felix Contr. Corp., supra,* at pp 316-317; *Palsgraf v Long Is. R. R. Co.,* 248 NY 339, 344). As the dangers associated with the type of epileptic seizures suffered by Adrienne are serious and obvious, the State, in our opinion, breached its duty to take reasonable precautions to protect her from injury by knowingly placing her in a State-inspected and certified family care home with bathroom facilities which prevented access to her in the event of an emergency *(see, Comiskey v State of New York,* 71 AD2d 699, *supra; Zajaczkowski v State of New York,* 189 Misc 299, 302).

It is well settled that a finding of negligence does not impose liability unless such negligence is found to have been a proximate cause of the injuries suffered. The claimants' burden, then, is to show that the State's conduct was a substantial causative factor in the sequence of events which led to Adrienne's injuries *(see, Nallan v Helmsley-Spear, Inc.,* 50 NY2d 507, 520). However, such a showing need not be made with absolute certainty nor exclude every other possible cause of the injury. Whether or not the delay occasioned by the locked bathroom door was a substantial factor in causing the injuries sustained is a question of fact which may be determined by a review of the expert medical testimony. All of the experts agreed that the amount of time during which the skin is exposed to a source of heat is a significant factor in the development and degree of severity of the resulting burn. The body's ability to disperse the heat being applied to it is

diminished as the temperature of the water increases and as more of the body surface is covered by the water. Here, it is apparent that certain critical limits were exceeded with respect to the temperature of the water, the area of skin exposed to the heated water and the amount of exposure time which necessarily resulted in the severe burns sustained by Adrienne. The facts and circumstances were present in sufficient quantity and quality so as to permit a finding that Adrienne's injuries were caused by prolonged exposure to hot water resulting from an inability to expeditiously rescue her. We find no reason to disturb that finding since the defendant's negligence with respect to the lock caused the delay and was, therefore, a substantial factor in causing Adrienne's ultimate injuries and was a proximate cause thereof.

While we agree with the State that Adrienne was entitled to privacy, we find insupportable, with respect to her particular situation, the position of the Commissioner of Mental Health that the interest of such privacy in family care homes overrides the interest in access to bathrooms from the outside, even where such access would be indicated because of the specific conditions of a resident. These two interests are not mutually exclusive. The State's duty herein was to provide Adrienne with a reasonably safe environment given its knowledge of her known propensity for seizures. The fulfillment of that duty could very well have been accomplished by a bathroom lock which permitted entry from the outside by a key kept exclusively in the possession of the McNairs. This would have accommodated the patient's right to privacy while, at the same time, providing immediate access in emergency situations such as that which did, in fact, occur.

This court is in full sympathy with the goals and ideals upon which the normalization process is based and is, therefore, loathe to judicially impose liability which might prompt the State to limit or abandon family care home programs due to the potential financial burden. Where progress has been achieved in the care, treatment and rehabilitation programs of the mentally ill or disabled, the courts, in exercising their judicial responsibilities, should act with restraint in imposing burdens upon such programs. Despite our reluctance to inhibit the State, in any way, from continuing to structure similar rehabilitative and normalization programs, the particular facts of this case permit the imposition of liability upon the State.

For the reasons set forth above, the modified judgment appealed from should be affirmed.

We note that the State abandoned its appeal from the original judgment in this case, entered October 11, 1983. In any case, said judgment was superseded by the modified judgment. Therefore, the appeal from the original judgment is dismissed.

MOLLEN, P. J., RUBIN and LAWRENCE, JJ., concur.

Appeal from a judgment of the Court of Claims entered October 11, 1983, dismissed as abandoned. Said judgment was also superseded by the modified judgment.

Modified judgment of the Court of Claims entered January 16, 1984, affirmed.

The claimants are awarded one bill of costs.