Caroline K. Simon, J.
Mario Santana, Sr. was appointed administrator of the estate of his deceased infant son Mario, Jr., by Surrogate Moss of Kings County on October 3, 1963, and has filed this claim for wrongful death due to alleged negligence of the State in its care and treatment of the deceased while a student and patient in the Willowbrook State School and Hospital on Staten" Island, Bichmond County, City and State of New York. The claim, timely filed with the Court of Claims and the office of the Attorney-General on October 8, 1963, has neither been assigned nor submitted to any other court or tribunal for hearing or determination.
Mario Santana, Jr. was born in New York City at Polyclinic Hospital on April 15, 1957, the second child of Mario and Generosa Santana. The hospital report recorded it was a difficult delivery, with instruments, after 16% hours of labor, by forceps, the mother having rheumatic heart disease. He was diagnosed as a mentally retarded child with brain damage, and subject to convulsions. He lived at home with his parents in a five-room apartment. His father testified that he was unable to talk but could cry and grunt, his hearing capacity was uncertain, he could eat solid food with his fingers and could hold a glass, but was unable to use a spoon or fork. He was not toilet-trained and wore diapers. He was able to walk with support. His general health was good, except for tonsil infections and colds *1037 accompanied by fever, and he had been treated as an outpatient in the Presbyterian Hospital Medical Center from the age of two to three years for convulsions. Medication prescribed for him there succeeded in reducing the number of these attacks from the initial frequency of three to four per day.
His father stated that Mario, Jr. was “ full of life at home,” ate well, with good appetite, rose early, but was unable to dress himself and had to be watched as he went from room to room. In the early Summer of 1963, Mr. Santana was advised by the Medical Center personnel to apply for the admission of his son to Willowbrook State School in Staten Island. This suggestion was followed. On Wednesday, June 13, 1963, Mario, Jr. was taken by his parents to the admission office in Building No. 2.
His father testified that Mario’s health on that date was excellent, although he was 8 pounds under weight and the record confirms he was only 37 pounds. The parents were advised not to visit the child during the initial four-week period of adjustment, although they were permitted to telephone and inquire as to their son’s condition. The father testified that he called almost every day and was told his child was in good condition.
After the initial four-week period, the Santanas visited their son in Building No. 2 every Sunday, and found him clean, full of life, and with good appetite. On August 29, Mario, Jr. was transferred from Building No. 2 to Building No. 27, and his parents were so notified.
On the first Sunday following his transfer, the parents paid their customary visit, and found “ a big change in his health, and the condition of the building The father noted that, his son was losing weight, was dirty, thirsty, hungry, and not in his usual playful manner. The parents had brought food, which he gulped rapidly. The mother changed his soiled diaper as they sat with him in the grounds. He seemed tired to them, and upon inquiry as to the reason for the loss of weight, an attendant assured them that it took time for a child to adjust to a move from one building to another.
The following Sunday, September 8, 1963, they paid another visit and the father testified that their child seemed to be “a walking skeleton”, “hardly recognized him”, seemed “like dead”, practically “dragged” to them, “filthy”, “couldn’t stand”, “ could hardly open eyes ”, and would not take food they had brought.
The father went to the nurse in the office and told her the child was dying, and he wanted to take him home. She referred Mr. Santana to the Administrative Director in another building, *1038 who asked him as to the reason for his request, and accompanied him outside where the mother and child were waiting on the grounds of the school. The Director looked at the child and asked the father to give them a chance for. two days and to bring the child indoors, and instructed a nurse to administer a vitamin injection, to feed him soft eggs, and to put him to bed.
The parents returned home, telephoned that evening and again the next day, and each time were assured the child was fine and doing well. At noon of Tuesday, September 10, the father again telephoned and was connected with the Director, who informed him that he was sorry to report the bad news that their son had died. The child’s body was returned to Brooklyn on September 11 by a funeral director, and embalmed. Prior to the funeral the following Monday, an autopsy as suggested by claimant’s counsel was performed on Friday in Brooklyn by the New York Medical Examiner. The cause of death in the autopsy was stated to be pulmonary congestion. The hospital report under date of September 10, 1963 stated that the cause of death was bronchopneumonia. At that time the record notes that the family refused permission for an autopsy. Funeral expenses were testified to have been $639.49.
The State’s supervising psychiatrist testified that he was responsible for the mental care of patients in sometimes three and sometimes five buildings, each building accommodating from 150 to 180 patients, and that consultants in various medical specialties were available when needed and that patients could be and were transferred to the hospital building whenever their condition required hospital care.
The senior psychiatrist of Building No. 2, to which Mario, Jr. had originally been assigned, testified, and the record confirms, that his weight was 38 pounds at admission, as against a normal weight range for six-year-olds of from 45 to 46 pounds, and that Mario, Jr. had gained 1 pound between June 13 and August 29, the day he was transferred to Building No. 27.
Since 1939, under section 8 of the Court of Claims Act, the State has waived its sovereign immunity from liability for the negligence of its agents in its charitable and other institutions. (See Weber v. State of New York, 53 N. Y. S. 2d 598 [1945].) This waiver has been recognized and enforced by a series of subsequent decisions which particularize the State’s responsibility to anticipate “risks reasonably to be perceived” (see Flaherty v. State of New York, 296 N. Y. 342, 347 [1947] and Williams v. State of New York (308 N. Y. 548 [1955]) as well as a definition of the degree of care to which the State shall be held. In McCrossen v. State of New York (277 App. Div. 1160 [1950]), *1039 the State was charged with the duty to preserve and protect the health of inmates of its institutions, and its failure to provide reasonable medical or surgical care and treatment constituted negligence for which it was held liable.
The instant situation places a mental defective in the exclusive custody of a State institution for an extended period of time (three months) and, according to claimant’s testimony, when the parents note a marked decline in the child’s physical condition and appearance, after an initially healthy interval at the school, a responsible authority of the facility urged them not to remove the infant from the State’s custody, asking for additional time within which to provide the care and, presumably, corrective treatment necessary.
The court is constrained to view these circumstances as indicia of inadequate care, especially when faced with the extreme paucity of the State’s evidence which, neither by testimony of witnesses nor through records, offered satisfactory explanation for this sudden decline in the health of the child. In a recent case decided in the Appellate Division, Third Department, Bradshaw v. State of New York (24 A D 2d 930), Judge Iíeyxoijds states: “ the State’s failure to call the attendants allegedly involved supports an inference that their testimony Avould not have been favorable to the State ”.
The court has not had presented to it such evidence as to Avarrant a finding on the care given at the institution. The court’s determination that there avus negligence for which the State must be held responsible in damages is based on the facts adduced that Mario Santana, Jr. was healthy for a. child with ^his disabilities when he Avas placed in the exclusive care of the State, no outside agency or person having intervened, and Avithin a few weeks of his placement in Building No. 27, was dead.
This six-year-old boy entered Willowbrook in what, for him, was his normal health. Within a few weeks he was dead. The entire final period of his life was spent under the State’s care and thus no intervening outside incident or agent could be the precipitating cause of his demise. A series of acts of negligence Avas proven by the claimant, which comprised a set of circumstances over Avhich only the defendant had sole control. This must, in the absence of any other plausible explanation by defendant, be considered as haAdng caused the infant’s death, and the court finds that a prima facie case of negligence was proven.
The court is aware that the State is not an insurer of the health of patients in its institutions, and that reasonable care is required of the State’s agents under such circumstances. *1040 The court finds that in the instant claim this requirement was not met.
“ A state institution or a hospital treating mentally ill patients may be responsible for inadequate supervision or for failure to give a patient proper or sufficient assistance where it is apparent from his condition that such is necessary.” (27 N. Y. Jur., Hospitals and Asylums, § 86.)
‘ ‘ One who receives an infant of tender years under his charge either gratuitously or otherwise owes him the legal duty of due care to prevent injury to him ” (Roche v. St. John’s Riverside Hosp., 96 Misc. 289, 291-292 [1916]). Though this citation specifically relates to a situation in which an injury caused the death, this court finds it equally applicable to the instant matter, in which a chain of conduct resulted in death. It is true that bronchial pneumonia unfortunately causes children’s death even outside State institutions. Here the gravamen lies in the failure of the defendant to prove proper care when the illness struck and immediately before, thus causing a weakened bodily condition with which to fight the disease. The defense has not offered such proof to overcome the prima facie case presented by claimant.
The hospital recorded, in claimant’s Exhibit No. 7, that Mario Jr.’s temperature was 99.4 degrees on admission and his physical state was “good — clean—no vermin” and the condition of his person as “ good ”. In his mental status, it was recorded that he was an “ underdeveloped child ”, with “ functioning at best at a 2-year level ”, and his diagnosis was “ chronic brain syndrome with mental deficiency severe, probably due to birth injury ”. All who thereafter worked with him and cared for him were exclusively in the employ of the State.
The only evidence of the care given to him after admission comes from employees of the State and the hospital record. Though doctors are presumed to have used their best medical judgment in prescribing and must be sustained if reasonable in those judgments, the record for the defense does not overcome the prima facie case presented by the claimant.
On the evidence before it, the court finds that the failure of the State to provide reasonably adequate care for its ward was the competent producing cause of his death, and that the State must be held liable in damages for this unfortunate event.
In assessing damages, however, the court considers the physical and mental condition of the child as militating against a normal and productive life expectancy. For pain and suffering during the final weeks and for such possible earnings as a child in his disadvantaged condition might be able to effect, the *1041 court finds damage in the amount of $6,000, which includes the cost of funeral expenses paid by claimant administrator.
Defendant’s motions to dismiss for failure to present a prima facie case and for failure to prove his case by a fair preponderance of the credible evidence, both motions having been made at the conclusion of claimant’s case, and on which decision had been reserved by the court, are now denied.