# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 90
William D. Maldovan, &c.,
     Appellant,
    v.
County of Erie et al.,
     Respondents.

John T. Loss, for appellant.
Robert P. Goodwin, for respondents.
City of New York, amicus curiae.

TROUTMAN, J.:

Plaintiff alleges that failures on the part of various government agencies, including

two providing social services, caused grievous harm in this tragic case. Despite the

heartbreaking events involved, in which the victim's mother and brother, now serving

- 1 -

lengthy prison terms for their actions, sexually assaulted, abused, and murdered her in her home, we decline to expand this Court's special duty doctrine. "A well settled rule of law denies recovery in cases like this" (*McLean v City of New York*, 12 NY3d 194, 204 [2009]). "The rationale for this rule is that the cost to municipalities of allowing recovery would be excessive [and] the threat of liability might deter or paralyze useful activity," endangering the ability of government agencies to provide crucial services to the public (*Laratro v City of New York*, 8 NY3d 79, 82 [2006]).

I.

Laura Cummings was a 23-year-old woman with developmental disabilities who lived with her mother, Eva Cummings. In 2009, Laura's brother, Richard, who lived out of state, contacted a family friend with concerns about Laura's well-being after another family member informed Richard that Laura had sustained suspicious injuries. Mistakenly believing that Laura was under 18 years old, the family friend contacted Child Protective Services (CPS) about these concerns. A CPS caseworker visited the home, and both Eva and Laura, when interviewed alone, provided the same benign explanation for Laura's injuries. CPS thereafter closed the case and informed the family friend that the report was unfounded.

Months later, Richard heard again that Laura was injured, with facial bruising, and contacted the same family friend, who in turn contacted Adult Protective Services (APS). APS caseworkers visited the home, but Eva refused to allow them to speak with Laura alone. In Eva's presence, Laura gave the caseworkers the same explanation for her injuries, and the caseworkers did not observe any facial bruising. After speaking with another

family member, APS closed the case and told the family friend that the report was unfounded. Richard subsequently called APS but was told that the report was investigated, that caseworkers did not find anything of concern, and that he should call with any new developments.

In November 2009, Laura ran away from home and was found at an abandoned Girl Scout camp by two Erie County Sheriff's deputies. Believing that Laura and Eva had a verbal altercation, and learning nothing to suggest that Laura should not be brought home, the deputies returned Laura to Eva's care.

In January 2010, Eva and Laura's brother, Luke Wright, tortured and murdered Laura in her home. Eva and Wright were convicted of various crimes and sentenced to lengthy prison terms (*see People v Wright*, 107 AD3d 1398 [4th Dept 2013], *lv denied* 23 NY3d 1026 [2014]). The public administrator of Laura's estate commenced these actions against the County of Erie and the Erie County Sheriff (defendants), alleging, among other things, that the CPS and APS caseworkers, as well as the Sheriff's deputies, were negligent in the performance of their duties, leading to Laura's death.

The parties moved for summary judgment, and Supreme Court denied both motions. The Appellate Division affirmed the order denying plaintiff's motion for summary judgment but reversed the order denying defendants' motion and granted summary judgment to defendants, dismissing the complaints against them (*see Maldovan v County of Erie*, 188 AD3d 1597 [4th Dept 2020]; *Maldovan v County of Erie*, 188 AD3d 1601 [4th Dept 2020]). The Appellate Division concluded, as relevant here, that no special duty existed as a matter of law because "the fourth element [necessary to show a special

relationship with the municipality], justifiable reliance, cannot be met in this case" (*Maldovan*, 188 AD3d at 1598-1599).

This Court granted plaintiff leave to appeal (37 NY3d 911 [2021]). We now affirm.

II.

When a negligence claim is asserted against a municipality acting in a governmental capacity, as here, the plaintiff must prove the existence of a special duty (*see Ferreira v City of Binghamton*, 38 NY3d 298, 308-310 [2022]; *Turturro v City of New York*, 28 NY3d 469, 477-478 [2016]). We have recognized that a special duty may arise in three situations: where "(1) the plaintiff belonged to a class for whose benefit a statute was enacted; (2) the government entity voluntarily assumed a duty to the plaintiff beyond what was owed to the public generally; or (3) the municipality took positive control of a known and dangerous safety condition" (*Tara N.P. v Western Suffolk Bd. of Coop. Educ. Servs.*, 28 NY3d 709, 714 [2017] [internal quotation marks omitted]).

Although plaintiff raises an argument before this Court based on the first method (statutory duty), that argument is unpreserved for appellate review. Plaintiff alleged in the complaint that defendants voluntarily assumed a duty to Laura beyond that owed to the public generally. It is true, as the dissent notes, that in the bill of particulars plaintiff alleged a violation of Social Services Law § 473. Plaintiff does not assert, however, that he raised the issue of statutory duty either in support of plaintiff's own motion for summary judgment or in opposition to defendants' motion, and the Appellate Division did not address the issue. We note that if, as the dissent concludes, this Court's decision in *Mark G. v Sabol* (93 NY2d 710, 721-722 [1999]) is distinguishable and the legislature had

intended to create a private right of action in Social Services Law § 473 (3), the legislature is of course free to make that intent clear (*see* dissenting op at 20-26).

Plaintiff also relies on the second method, which we have sometimes referred to as a "special relationship" (*see Tara N.P.*, 28 NY3d at 714; *Valdez v City of New York*, 18 NY3d 69, 80 [2011]).  We conclude, however, that defendants met their prima facie burden to demonstrate that they did not voluntarily assume a duty to Laura, and plaintiff failed to raise a triable issue of material fact in opposition.

As we have often stated, to establish that the government voluntarily assumed a duty to the plaintiff beyond what it generally owes to the public, the plaintiff must establish:

> " '(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking' " (*Tara N.P.*, 28 NY3d at 714-715, quoting *Cuffy v City of New York*, 69 NY2d 255, 260 [1987] [emphasis omitted]).

"[A]ll four elements must be present for a special duty to attach" (*Tara N.P.*, 28 NY3d at 715).

We agree with the Appellate Division that under the circumstances presented here, defendants established as a matter of law that the government employees took no action that could have induced justifiable reliance, and plaintiff failed to raise a triable issue of fact in opposition.  As we explained in *Cuffy*, the justifiable reliance element

> "provides the essential causative link between the 'special duty' assumed by the municipality and the alleged injury. Indeed, at the heart of most of these 'special duty' cases is the

unfairness that the courts have perceived in precluding recovery when a municipality's voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced [the injured party] either to relax [their] own vigilance or to forego other available avenues of protection" (*Cuffy*, 69 NY2d at 261).

Months before her death, both CPS and APS investigated the reports that Laura was being abused, concluded that those reports were unfounded, closed their investigations, and advised Richard that the investigations were closed and would not be reopened without new information. As the Appellate Division noted, Richard "did not in fact relax his own vigilance inasmuch as he made two follow-up calls to the APS caseworker asking her to reopen the investigation, and he was not induced to forego other avenues of relief" (*Maldovan*, 188 AD3d at 1599). Similarly, the Sheriff's deputies took no action that could have induced reliance.

Plaintiff asserts that the *Cuffy* factors for establishing a special duty assume that the injured person is a competent adult who is reasonably capable of pursuing other avenues of protection if government has failed to do its job. Plaintiff argues that it is unfair to apply the *Cuffy* test when the injured party is a child or an adult of diminished capacity and urges us to adopt the Appellate Division decision in *Boland v State of New York* (218 AD2d 235 [3d Dept 1996]) to address that deficiency. In *Boland*, the Appellate Division relied on the existence of Social Services Law article 6, title 6, which established CPS, to satisfy the elements of a voluntarily assumed duty. Specifically, the Court held that the existence of that statutory scheme demonstrated that the State "affirmatively and voluntarily assumed a duty to act" on behalf of abused children, that the legislature had acknowledged that

inaction could lead to harm, and that "the extensive and detailed statutory scheme at issue, which has as its avowed purpose the protection of a discrete class of individuals, i.e., abused and maltreated children . . . obviate[d] the need for claimant to independently establish the requisite contact and reliance" (*id.* at 240-241). Plaintiff asks us to adopt that reasoning here and hold that because Laura was part of the class of adults the legislature sought to protect when it established APS, plaintiff should not be required to establish justifiable reliance in this case. Our dissenting colleague similarly proposes that the special duty rule may be satisfied whenever CPS or APS receives a report of abuse, opens an investigation, and has contact with the injured party (*see* dissenting op at 26-27).

We decline plaintiff's invitation. In an effort to acknowledge the difficulty vulnerable victims may face in demonstrating these factors, we have previously relaxed the requirements of the special duty rule to allow a competent family member of the injured party to satisfy the elements of direct contact and justifiable reliance (*see Applewhite v Accuhealth, Inc.*, 21 NY3d 420, 431 [2013]; *Sorichetti v City of New York*, 65 NY2d 461, 469 [1985]). Such an approach, which requires the courts to construe the special relationship analysis in the plaintiff's favor, provides a pathway for vulnerable victims to satisfy the special duty requirements where they may otherwise be unable to do so. Here, the Appellate Division appropriately assessed whether Richard justifiably relied on promises or actions by government employees that would have induced him to relax his vigilance regarding Laura's safety and concluded that he did not (*see Maldovan*, 188 AD3d at 1599). We do not address whether or how the special duty rule should apply in a different case where the injured party was a child or adult with developmental disabilities

incapable of pursuing other avenues of protection and did not have a competent adult family member advocating on their behalf.

III.

Contrary to the dissent's suggestion, we do not blithely decline to amend the common law rule in this case without reason. It is undeniable that plaintiff alleges that the failure of government to do its job has caused immense harm under heartbreaking circumstances; this is unfortunately not unusual in special duty cases (*see Tara N.P.*, 28 NY3d at 716; *McLean*, 12 NY3d at 197). As we recognized in *McLean*, however, the special duty rule is based on the rationale that exposing municipalities to tort liability may "render them less, not more, effective in protecting their citizens" (*McLean*, 12 NY3d at 204).

*McLean* is another tragic case, involving the government's failure to remove a daycare program from the list of registered providers after substantiated complaints regarding child safety, which resulted in the plaintiff's placement of her child in that program and the child's subsequent serious injury (*see id.* at 197-199). The plaintiff argued, in part, that "the helplessness of young children, and the State's powerful interest in protecting them from neglect or abuse, should lead [the Court] to announce the existence of a special relationship between those who register child care providers and parents and children who need child care" (*id.* at 204). The Court rejected that assertion:

> "This is, in substance, an invitation to relax the special relationship rule to accommodate an especially appealing class of cases. We decline the invitation. A well settled rule of law denies recovery in cases like this, and that rule, by its nature, bars recovery even where a government blunder results in

injury to people deserving of the government's protection"
(*id.*).

We must again, as in *McLean*, decline the "invitation to relax the special relationship rule to accommodate an especially appealing class of cases," out of concern for the possibility that "exposing municipalities to tort liability would be likely to render them less, not more effective in protecting their citizens" (*id.*).[1]   Imposing liability here where Laura's family members did not justifiably rely on any promises by CPS or APS and relax their vigilance as a result could impose a "crushing burden" on those agencies, which may render them less effective in fulfilling their mission to protect vulnerable individuals (*id.*). To the extent that CPS and APS caseworkers acted negligently in failing to protect Laura from the abuse and death she suffered at the hands of her mother and brother, lawsuits "are

---

[1] We are not persuaded by our dissenting colleague's citation to a dissenting opinion that this frequently cited rationale for the special duty rule is a "myth" (dissenting op at 18). Although no one suggests that "allowing Laura's claim to proceed would bankrupt Erie County" (*id.* at 17), we must consider the impact of our decision beyond this case and these parties.  The potential for significant economic repercussions, and the resulting potential decrease in beneficial services, have troubled our predecessors on this Court for decades and contributed to the shaping of the special duty doctrine. If, as the dissent proposes, the special duty rule may be satisfied whenever CPS or APS receives a report of abuse, opens an investigation, and has contact with the injured party (*see* dissenting op at 26-27), it is possible that the resulting, potentially "crushing" burden of liability might impel government to "withdraw or reduce" these protective services (*McLean*, 12 NY3d at 204). Furthermore, such a rule may cause CPS and APS to protectively remove children or vulnerable adults from their homes when it is not warranted, in order to avoid the possibility of subsequent liability, which may disproportionately impact families of color (*see* New York State Bar Association, Committee on Families and the Law, *Racial Justice and Child Welfare*, April 2022, available at https://nysba.org/app/uploads/2022/03/Committee-on-Families-and-the-Law-April-2022-approved.pdf).   Allowing such decisions regarding allocation of resources and services to be made by the government, and not this Court, is one of the primary reasons for the special duty rule (*see Ferreira*, 38 NY3d at 316).

not the only way of dealing with government failure" (*id.*). The special duty rule "is intended, in part, to ensure that municipalities do not become insurers for the injurious conduct of third parties" (*Ferreira*, 38 NY3d at 316, citing *Valdez*, 18 NY3d at 75).[2] Where, as here, the elements of a voluntarily assumed duty, including justifiable reliance, were capable of being satisfied through Laura's family members, but simply were not met, the sound principles supporting the special duty rule require us to decline to amend that rule here.

In light of our holding, we do not address plaintiff's remaining contentions, including whether the Appellate Division correctly concluded that a cause of action for negligent investigation is not recognized in New York.

Accordingly, the orders of the Appellate Division should be affirmed, with costs.

---

[2] We disagree with the dissent that *Ferreira* constituted a modification of the special duty rule (*see* dissenting op at 16-17). Rather, in *Ferreira*, we concluded that the police planning and execution of a no-knock warrant fits comfortably within the well-established third category of special duty, i.e., where the municipality takes "positive control of a known and dangerous safety condition" (*see Ferreira*, 38 NY3d at 317-318). That category of special duty is not at issue in this case.

WILSON, J. (dissenting in part):

Laura Cummings is dead. She was an intellectually disabled 23-year-old with the mental age of an 8-year-old. Over at least the last six months of her short life, she was continuously tortured, raped, sodomized and ultimately murdered. All of this happened in her own home. All of this happened at the hands of her own mother and brother. All of

- 1 -

this happened despite numerous complaints to, and visits by, caseworkers from Erie County's offices of Child Protective Services and Adult Protective Services.

I agree with the majority's characterization of the circumstances as "tragic" and "heartbreaking;" one should not mistakenly believe that what happened to Laura is rare. In truth, the physical and psychological abuse of intellectually disabled children and adults, especially women, is commonplace.[1]  When the State decided to deinstitutionalize many such persons, it entrusted their safety to Adult Protective Services (APS) and Child Protective Services (CPS) districts throughout the state.  The majority's holding immunizes the very agencies bound by law to protect vulnerable adults, when the legislature has clearly stated those agencies do not enjoy immunity from grotesque agency failures such as those turning a blind eye to Laura's horror.

While acknowledging Laura's tragic and heartbreaking doom, the majority forthrightly explains why it thinks Laura's claims against Erie County fail: the majority will not "expand this Court's special duty doctrine" because "a well settled rule of law denies recovery in cases like this. . . The rationale for this rule is that the cost to

---

[1] (Danny Hakim, *At State-Run Homes, Abuse and Impunity*, NY Times, Mar 12, 2011 [https://www.nytimes.com/2011/03/13/nyregion/13homes.html] [detailing rampant abuse of disabled people in state-run homes]; Erika Harrell, *Crime Against Persons With Disabilities, 2009-2015-Statistical Tables*, Bureau of Justice Statistics, US DOJ, July 2017 at pg 1 [https://bjs.ojp.gov/content/pub/pdf/capd0915st.pdf] ["In every year from 2009 to 2015, the rate of violent victimization against persons with disabilities was at least twice the age-adjusted rate for persons without disabilities"]; Joseph Shapiro, *The Sexual Assault Epidemic No One Talks About*, NPR. org, Jan 8, 2018 [https://www.npr.org/2018/01/08/570224090/the-sexual-assault-epidemic-no-one-talks-about] ["People with intellectual disabilities are sexually assaulted at a rate seven times higher than those without disabilities."]).

municipalities . . . would be excessive [and] the threat of liability might deter or paralyze useful activity" (majority opinion at 1-2).

Keep in mind the following points about the majority's explanation: (1) the majority recognizes that the "special duty" rule is a common-law rule created and periodically modified by the courts; (2) the "special duty" rule *allows* some persons injured by governmental actors to sue the government for its own negligence and recover money damages from the government, despite the cost of damage awards and threat of governmental paralysis; (3) the majority's decision rests solely on its determination that Laura did not reasonably rely on the government – not any other requirement of the "special duty" test; and (4) there is no well settled rule in "cases like this" – cases in which the legislature has told us that governmental employees lack immunity for their acts of gross negligence in caring for a specified class of vulnerable persons.

I

Laura lived with her mother, Eva Cummings, and her brothers, among them, Luke Wright. Eva and Luke were convicted of Laura's murder and are now in prison. Because Laura is dead and has no responsible relatives, the Erie County public administrator, William Maldovan, brought this suit on behalf of her estate. Unquestionably, the precedent and principle matter more than the profit.

Child Protective Services records show that the Cummings household had been subject to numerous reports of abuse over the years, and CPS had found several allegations of Eva abusing Laura as "indicated", meaning that CPS found credible evidence to

substantiate abuse.  In the several months leading up to her death, Laura was often tied to a chair, with a bag over her head, and subjected to repeated physical and sexual abuse by her mother and her brother Luke, which included being violated with a broomstick.

Six months before Laura's death, in July of 2009, Town Justice John Stevens, who was a neighbor of the Cummings family, contacted the Statewide Central Register of Child Abuse and Maltreatment to report that Richard Cummings, another one of Laura's brothers stationed outside the country on military duty, was concerned about Laura's well-being. Justice Stevens reported that Richard informed him that Eva had cut Laura's arm with a knife.  Justice Stevens also advised the Statewide Register that Laura was "mentally challenged".  Because he mistakenly thought Laura was 16, he reported the suspicion of abuse to CPS instead of APS.[2]

CPS caseworker "LA"[3] visited the Cummings home in response to Justice Stevens' report of Laura's possible abuse.  CPS never made a referral to APS because LA, though learning the Laura was an adult and therefore not within CPS's jurisdiction, concluded

---

[2] The record is unclear as to precisely when CPS determined Laura was an adult, and therefore within APS's jurisdiction instead of CPS's.  The initial report generated from Justice Stevens' call stated that the records of a previous abuse case concerning Laura showed her age as 23.  The CPS case worker assigned to Laura's case testified that she visited Laura's home in response to Justice Stevens' call even though she was unsure whether Laura was a child or adult, deciding that, because her records showed that Laura's 16-year-old sister, Crystal, lived in the house, Laura might be a child.

[3] I have obscured the names of the caseworkers here because the standard of review requires us to take the facts in the light most favorable to the party opposing summary judgment.  Because no factfinder was asked to determine any facts, it would be unfair to the caseworkers involved should readers conclude the facts have been found to be as stated herein.

from her visit that the allegation of abuse was unfounded. During that visit, LA spoke separately with both Laura and Eva. Laura denied any abuse by anyone, including her mother, as did Eva. Both claimed that the cuts on Laura's arms were a result of Laura falling on the porch while carrying a glass. LA testified that she was not sure when, and to what extent, she (or her supervisor at CPS) reviewed the extensive history of prior abuse reports but, in any case—LA ultimately decided Laura's story seemed credible and nothing she observed signaled abuse. CPS sent a letter to Justice Stevens informing him the claims were unfounded and that it was closing the case.

Four months before Laura's death, in September 2009, Justice Stevens called again, this time calling APS. He reported that Laura had facial bruising and would not respond to questions about where the bruising came from. There was also a recent change in her demeanor—she had become withdrawn and introverted. Justice Stevens again reported that Laura, Eva, as well as the brothers Luke and Edward, were developmentally delayed. The case was assigned to APS caseworker "HK".

HK performed a home visit, accompanied by "MS", a new caseworker there to "shadow" HK for training purposes. HK described Eva's demeanor when answering the door as "brusque and standoffish". She refused to let them into the house and refused to let them speak with Laura alone. Eva said she had to be present during Laura's interview to make sure Laura did not "tell lies again"—Laura's alleged "lies" were also the reason Eva gave for taking Laura out of school. HK made no further effort to speak to Laura alone

or to enter the home, despite internal APS policies stating that case workers should always endeavor to interview clients alone and in their home environment.

HK did not recall observing any facial bruising except a friction burn mark on Laura's nose and chin. When asked, in the presence of her mother, Laura said she fell coming up the porch steps. As they were leaving, MS noticed Laura's feet were red and swollen. HK did not recall whether she noticed Laura's feet and did not remember at what point that day she and MS discussed them. They did not go back to inquire about Laura's feet, but HK called later to ask Eva about Laura's feet.

When HK called, a woman named Joyce Landle answered the phone. She identified herself as Laura's guardian and Eva's cousin. During the visit, Eva had first said she herself was Laura's legal guardian, then corrected herself to say that Joyce, her sister, was the legal guardian. Ms. Landle was aware of the referral and HK's visit. HK asked about the swollen feet—Joyce answered that the feet had been like that for a "long time." Ms. Landle told HK that the only doctor in town would not treat any of the family because of unpaid bills, but later in the conversation agreed to take Laura to the doctor to have her feet looked at. HK never followed up with Ms. Landle to ensure Laura had been taken to the doctor and admitted during her deposition that Ms. Landle's story about unpaid bills made no sense because Medicaid covered Laura's medical expenses. Instead, on the same day of

the phone conversation with Ms. Landle, HK closed the case as unfounded and in December 2009 sent a letter addressed to Laura informing her of the same determination.[4]

Richard Cummings called HK twice, after she closed the case. He insisted that Laura was being abused (saying she had a black eye) and that she should be removed from the home. HK responded that Laura did not have a black eye when she visited, and had only the friction burn mark on her nose and chin. She instructed Richard to call back if he had new information. She did not generate a new intake report for either of Richard's calls.

In November of 2009, sheriff deputies Connolly and Barbaritz responded to a call about a suspicious person. According to the report, a mentally disabled woman was living in an old girl scout camp after an altercation with her mother. The woman was Laura. When the deputies arrived, Laura was huddled in the comer with a blanket, quiet and introverted, unable or unwilling to speak with them. Deputy Barbaritz could tell, however, that Laura was intellectually disabled. The deputies did not know of or ask about the altercation Laura had with her mother and did not find out whether anyone had hurt her. The deputies returned Laura to her mother without making any inquiry or evaluating whether she was a domestic abuse victim. Laura was murdered two months later.

Mr. Maldovan, on behalf of Laura, identified numerous APS policies violated by its caseworkers (and some by CPS, to the extent it failed to refer Laura's case to APS and

---

[4] Running the text of the letter through a Flesh Kincaid reading level calculator shows its complexity at the 11th grade level. The opening paragraph of my dissent produces a grade level of 8.6. Laura had the mental age of a second or third grader.

issued an "unsubstantiated" determination when it had no jurisdiction to do so). APS's

subsequent disciplinary action against HK provides further evidence of APS's gross

negligence.[5] No extended discussion of the evidence demonstrating APS's and CPS's

negligence is required here, because the majority's sole basis for rejecting Laura's claim is

that "government employees took no action that could have induced justifiable reliance"

(majority op at 5).

## II

### A

The prospect that New York State (and its political subdivisions) should pay for

injuries it causes has been established for centuries. The Erie Canal Act of 1817 authorized

canal commissioners to pay for takings of land required for the construction of the canal

(L 1817, ch 262). In 1825, the commissioners were further empowered to assess and pay

claims for all types of damages caused by or connected with the work on the Erie or

Champlain canals (L 1825, ch 275), which was broadened in 1870 to include damages

---

[5] The County's disciplinary letter to HK listed numerous steps that "any reasonable caseworker" should have taken, but which HK failed to do, including: returning for a second visit to interview Laura in private or request the assistance of law enforcement to speak with Laura alone, because access had been blocked by the very person suspected as the perpetrator; assessing whether she should obtain a court order to access the home as "environmental assessment is a critical element of the assessment process"; investigating whether Laura's needs could be best met *in her home*; verifying information provided to her by collateral sources, in this case, Ms. Landle; following up on whether Laura was receiving treatment for her red and swollen feet; and treating the two calls by Richard Cummings, after APS closed the case, as new referrals and initiating an intake process for each.

sustained by the use or management of the canals arising from the negligence of any state official (L 1870, ch 321).

Meanwhile, the "great mass of claims against the state were submitted to and passed on directly by the legislature, which provided for their payment" (*People ex rel. Swift v Luce*, 204 NY 478, 483-84 [1912]). However, the appropriations process for paying claims against the state,

> "became so unsatisfactory that the Constitution was amended in 1874 so as to prohibit the Legislature from auditing or allowing any private claim or account against the State. (Article 3, § 19.) This prohibition made it necessary for the Legislature to provide some other means for auditing private claims and for that purpose it created the Board of Audit, consisting of the Comptroller, Secretary of State and State Treasurer, who were authorized to hear all private claims and accounts against the State, except such as were then heard by the canal appraisers."

(Fifteenth Annual Report of the Court of Claims of the State of New York, April 12, 1916, at 7-8). The Board of Audit was replaced by a Court of Claims in 1897 "with somewhat enlarged jurisdiction," which was in turn replaced, briefly, by a Board of Claims, which was again replaced by the Court of Claims in 1915 (*id.* at 8). Throughout this time, the State maintained sovereign immunity, so only those claims (or types of claims) specifically allowed by statute could provide for recovery against the State. Thus, for example, in *Smith v State* (227 NY 405, 410 [1920]), we held that a plaintiff injured because of the negligence of State employees in placing a wire across a path on a State-owned walkway was barred from recovering because the State had not made "an express waiver of the state's immunity from liability for the tortious acts of its officers and agents."

The sea change came in 1929, when New York enacted a blanket waiver of its sovereign immunity for tort actions: "The state hereby waives its immunity from liability for the torts of its officers and employees and consents to have its liability for such torts determined in accordance with the same rules of law as apply to an action in the supreme court against an individual or a corporation, and the state hereby assumes liability for such acts" (L 1929, ch 467). Ten years later, the legislature broadened the waiver to reach all causes of action, not just those sounding in tort (L 1939, ch 860). As we have explained:

> "[T]he *Smith* Court's interpretation of the waiver provision of section 264 was at odds with the public policy which seeks to reduce rather than increase the obstacles to recovery of damages, whether defendant is a private person or a public body (*see*, *Abbott v Page Airways,* 23 NY2d 502, 507; *see also*, *Bing v Thunig,* 2 NY2d 656, 666 ["(l)iability is the rule, immunity the exception"], quoted with approval in *Abbott, supra,* at 507, n 2). Thus, the Legislature subsequently enacted a new statute to overcome the ruling in *Smith*. That revision, the substance of which was incorporated into the statute now before us, "extended, supplemented and enlarged" the waiver to remove the defense of sovereign immunity for tort actions" (*Jackson v State of New York,* 261 NY 134, 138, *rearg denied* 261 NY 637) (*Brown v State*, 89 NY2d 172, 180 [1996]).

Following the legislature's comprehensive waiver of sovereign immunity in 1939, we understood that the State (and other governmental subdivisions) must be held liable just as private parties would be. So, for example, we held that a child injured by other children in a State-created school for delinquent children could recover damages from the State on a theory of negligent supervision, distinguishing our prior contrary precedent on the basis of the State's waiver of sovereign immunity (*Bloom v Jewish Bd. of Guardians*, 286 NY 349 [1941]). In *Robison v State* (292 NY 631 [1944]), we affirmed a negligence award against a State hospital brought by an attendant who slipped on cooked cereal on the dining

room floor.  In *Bernardine v City of New York* (294 NY 361 [1945]), we affirmed a damage

judgment for the city's negligence where the plaintiff was injured by a runaway police

horse.  The trial court granted judgment for the city "on the single ground that recovery

was barred by the City's common-law immunity from liability for wrongful performance

of governmental duties;" the Appellate Division reversed, holding that the General

Municipal Law rendered the city liable for negligence "in the operation of a municipally

owned vehicle or other facility of transportation," which included a police horse (*id.* at

364).  We affirmed, noting that the statute was susceptible of the Appellate Division's

interpretation, but added:

> "Even so, there was no compelling reason why this plaintiff should have
> taken his stand upon the above provision of the General Municipal
> Law. Section 8 of the Court of Claims Act says: "The state hereby waives its
> immunity from liability and action and hereby assumes liability and consents
> to have the same determined in accordance with the same rules of law as
> applied to actions in the supreme court against individuals or corporations". .
> . . None of the civil divisions of the State - its counties, cities, towns and
> villages - has any independent sovereignty (see N.Y. Const., art. IX, § 9; *City
> of Chicago* v. *Sturges*, 222 U.S. 313, 323; *Keifer & Keifer* v. *R.F.C.*, 306
> U.S. 381. Cf. *Gaglio* v. *City of New York*, 143 F. 2d 904). The legal
> irresponsibility heretofore enjoyed by these governmental units was nothing
> more than an extension of the exemption from liability which the State
> possessed. (*Murtha* v. *N.Y.H.M. Col. & Flower Hospital*, 228 N.Y. 183,
> 185.) On the waiver by the State of its own sovereign dispensation, that
> extension naturally was at an end and thus we were brought all the way round
> to a point where the civil divisions of the State are answerable equally with
> individuals and private corporations for wrongs of officers and employees, -
> even if no separate statute sanctions that enlarged liability in a given
> instance" (*id.*).

The effect of the waiver of sovereign immunity on tort claims based on

governmental negligence is illustrated by comparing two factually similar cases.  In

*Hughes v Monroe County* (147 NY 49 [1895]), we held that an employee of the Monroe County Insane Asylum, severely injured by operating a steam mangle, could not recover in tort from the County. We explained that because the County "shared with the state the burden of caring for the insane," the State's sovereign immunity protected the County as well. After the legislature waived the State's sovereign immunity, we decided *Paige v State* (269 NY 352 [1936]), in which a police court committed a girl to a privately-owned reformatory authorized by statute to hold her until the age of majority. She was made to operate dangerous machinery, which maimed her. The Court of Claims held that the negligence of those in charge of the reformatory "was a tort of officers and employees of the State," so that the State was liable in tort for her injuries. The Appellate Division increased the damage award and otherwise affirmed. We also affirmed, holding:

> "The quasi-penal institution in which the claimant was confined was a governmental agency to which the State had committed in part its function to care for wayward minors. (Laws of 1902, ch. 603; *Corbett* v. *St. Vincent's Industrial School*, 177 N. Y. 16.) But the institution did not thereby acquire a status equivalent to that of the civil divisions of the State. (See *Murtha* v. *New York Homeopathic Medical College & Flower Hospital*, 228 N. Y. 183.) There is no misuse of language in saying that the State employed the institution. (Cf. *People ex rel. State Board of Charities* v. *New York Society for Prevention of Cruelty to Children*, 162 N. Y. 429, 434.) If the word "agent" were found in section 12-a of the Court of Claims Act would it be held that this case was outside the State's assumption of liability? The terms "agent" and "employee" have been used interchangeably in the cases that dealt with State immunity from liability for tort. (*Litchfield* v. *Bond*, 186 N. Y. 66, 82, 83; *Murtha Case, supra*, p.185.) In *Jackson* v. *State* (261 N. Y. 134, 138) it was said: "Section 12-a constitutes a recognition and acknowledgment of a moral duty demanded by the principles of equity and justice." In that spirit, we accept the construction of the section here adopted by the courts below." (*Paige v State*, 269 NY 352, 356 [1936]).

The above history establishes two important propositions.  *First*, New York State and its municipalities have always been liable to pay damages for some types of injuries arising from their own negligence.  Initially, the process was a mix of specific legislative appropriations and decisions of commissions or boards, which was subsequently transferred to the Court of Claims.  *Second*, in waiving sovereign immunity 93 years ago, the legislature completely "remove[d] the defense of sovereign immunity for tort actions" (*Brown*, 89 NY2d at 180) such that governmental actors would be subjected to the same standards as private defendants.  We further observed that "[i]nasmuch as there is no clear definition by which wrongs are classified as torts . . . [i]t is much more likely that the term was used generally to indicate a branch of the law broader than the then-existing categories and subject to expansion as new wrongs supporting liability were recognized" (*id.* at 182).

B

Although the legislature waived its sovereign immunity and required that it be treated no differently than any other defendant, the courts fashioned various immunities that barred recovery in some cases even when the government acted negligently.  Relevant here is the doctrine of governmental function immunity.  That doctrine is found in no statute; it is part of the common law fully within our control to make, shape, bend or alter.  The doctrine makes use of a distinction created well before New York waived it sovereign immunity: the distinction that municipal corporations "are possessed of dual powers; the one governmental, legislative or public, and the other proprietary or private" (*Missano v Mayor of NY*, 160 NY 123 [1899], citing Dillon, *Municipal Corporations* [fourth ed.] at

§ 66).[6]  In *Missano*, we held that the city was liable in tort "for the death of a child, who was run over and killed by a horse attached to an ash cart of the street cleaning department," because the city's duty to keep the streets clean was proprietary, not public, even though "the discharge of this duty might incidentally benefit the public health" (*id.* at 126, 129). The distinction between the governmental (public) and proprietary (private) functions of municipal corporations was imported from English common law (*see Springfield Fire & Mar. Ins. Co. v Keeseville*, 148 NY 46, 52-53 [1895] (explaining that under English common law, when a municipal corporation acted in its governmental capacity – for "public purposes and is for the public good . . . the corporation is exempt from all liability"). We noted that "the line of demarkation [between public and private] at times may be difficult to ascertain" (*id.* at 52), which is well evidenced by our holdings that street cleaning is private and water service is public.

That basic distinction, which provides an exemption from liability for municipalities acting in their governmental capacity, is a creature of the common law, which we have carried forward to the present day (*see Turturro v City of N.Y.*, 28 NY3d 469, 478-79 [2016]).  In carrying that doctrine forward over the past two centuries, we have altered it many times, as is not just our right, but our duty.  Cases in which our precedent has allowed for governmental liability (and, thus, necessarily are ones in which the government bore a

---

[6] That distinction arises from the legal status of municipal corporations.  In theory, it should be inapplicable to the state itself, which is not a corporation, but in more recent times that distinction has been applied to all governmental actors without regard to its genesis in the law of municipal corporations, which never had sovereign immunity to begin with.

special duty to the plaintiff, breached that duty and failed to establish the defense of governmental function immunity) , include, in addition to *Bloom* (negligent supervision of delinquent children), *Robison* (slip on porridge), *Bernadine* (runaway police horse), *Missano* (horse-drawn street cleaning cart) and *Paige* (negligently maintained laundry equipment):

- *Haddock v City of New York* (75 NY2d 478 [1990]) (negligent screening of candidates for employment);

- *Brown v State of New York* (31 NY3d 514 [2018]) (negligent maintenance of highway);

- *Florence v Goldberg* (44 NY2d 189 [1978]) (negligence in failing to provide crossing guard at school crosswalk);

- *McCummings v NYC Transit Auth.* (81 NY2d 923 [1993]) (police negligence in shooting an unarmed fleeing suspect);

- *Galvin v Mayor of New York* (112 NY 223 [1888]) (negligently designed courthouse grate crushed a delivery person);

- *Garrett v Holiday Inns, Inc.* (58 NY2d 253 [1983]) (negligent town inspection and issuance of permits in violation of statutes);

- *Flamer v City of Yonkers* (309 NY 114 [1955]) (police negligence in shooting intoxicated man who posed no threat);

- *Mirand v City of New York* (84 NY2d 44 [1994]) (negligent supervision of students);

- *Meistinsky v City of New York* (309 NY 998 [1956]) (police negligence in killing an innocent bystander); and

- *Martindale v State* (269 NY 554 [1935]) (negligent supervision of mentally ill patient in state-run hospital resulting in patient's death)

Every one of those cases involved adjustments to the doctrines of special duty and governmental function, even if only implicitly, to permit recovery of money damages against the government in the circumstances described therein. Our court adapted the common law in each of these cases by creating an exception from the basic common-law proposition disallowing suit for negligent public acts by governmental entities acting in their governmental capacity. Most recently in *Ferreira*, the United States Court of Appeals for the Second Circuit spared us the effort of deciding whether Binghamton had met its burden to establish governmental function immunity, but certified to us whether a plaintiff needed to establish a special duty when the injurious governmental action was nonproprietary. We once again adjusted our common-law doctrine of special duty, holding that whenever the government owes a special duty to all persons within the premises at which a no-knock warrant is executed, encompassing both the planning and execution of the warrant.[7]

---

[7] The majority explains *Ferreira* as fitting within the third prong of our established special duty test: when a governmental actor takes control of a dangerous situation, and therefore not an expansion or innovation in the common law (majority op at 10 n 2). That characterization sells us short. The expansion of the common law comes in the holding that, at least for the third prong of our special duty test, there is no need to establish the special duty as to a particular known person, or even to an individual case: as a matter of

In myriad examples where a governmental entity has been held liable in negligence, the judgments have not caused the collapse of the government or paralyzed those governments from trying to do better. Those concerns which form the basis for the majority's refusal to recognize a special duty here, would be weighty if, for example, we were to impose tort liability whenever the police failed to stop a crime, or the fire department failed to prevent a fire, making the government an insurer against all ills. However, each of the above cases in which we have allowed an injured party to recover tort damages from the government is far more constrained, almost always confined to situations where the government had some reasonable ability to control the conduct, whether that be mopping cereal from an institution's floor, keeping a horse under control, or screening candidates for employment. Here, nothing in the record suggests that allowing Laura's claim to proceed would bankrupt Erie County or cause APS or CPS to stop visiting persons legally entitled to their support. Judge Keating addressed the fictional parade of horribles thusly:

> "The fear of financial disaster is a myth. The same argument was made a generation ago in opposition to proposals that the State waive its defense of "sovereign immunity". The prophecy proved false then, and it would now. The supposed astronomical financial burden does not and would not exist. No municipality has gone bankrupt because it has had to respond in damages when a policeman causes injury through carelessly driving a police car or in the thousands of other situations where, by judicial fiat or legislative enactment, the State and its subdivisions have been held liable for the tortious conduct of their employees. . . . That Linda Riss should be asked to bear the loss, which should properly fall on the city if we assume,

---

law, the special duty runs to all persons, known or unknown, in the case of all search warrants. In every prior special duty case, we have examined the existence of a duty as to that individual case, without setting out any broadly encompassing rule.

as we must, in the present posture of the case, that her injuries resulted from the city's failure to provide sufficient police to protect Linda is contrary to the most elementary notions of justice" (*Riss v New York*, 22 NY2d 579, 585-586 [1968] [Keating, J., dissenting]).[8]


IV


The above discussion brings us to the following place: New York and its municipalities have a long history of paying damages for their own negligence in a great variety of circumstances, and the limits on such payments for nearly the past century arise from judge-made doctrines that we have continually revised. Relevant here is the special duty doctrine, which affords an avenue by which a plaintiff can recover for the government's negligence even when the government is acting in its public, nonproprietary capacity.

---

[8] Unimpressed by Judge Keating, the majority pursues the very slippery slope argument he criticized. Recognizing a special duty would not lead to a damage award unless two other conditions were met: (1) the agency acted with gross negligence or willful misconduct, which are quite high standards (*Food Pageant, Inc. v Consolidated Edison Co.*, 54 NY2d 167, 1972 [1981] ["gross negligence had been termed as the failure to exercise even slight care"]; *Colnaghi, USA. v Jewelers Protection Servs., Ltd.*, 81 NY2d 821, 823-24 [1993] ["[gross negligence is] conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing" [internal citation and quotation marks omitted]); and (2) the agency failed to demonstrate its entitlement to governmental function immunity, which will completely immunize a governmental defendant even if a special duty has been breached (*Turturro v City of NY,* 28 NY3d 469, 478-79 [2016]; *Valdez v City of New York*, 18 NY3d 69, 75 [2011]). Of course, a plaintiff would also have to prove the other elements of a tort claim as well (proximate cause and damages). In any event, the short answer is that the legislature already balanced the costs and benefits, by providing immunity for ordinary negligence but not gross negligence (*see infra* at IV.A.).

We have "recognized that a special duty can arise in three situations: (1) the plaintiff belonged to a class for whose benefit a statute was enacted; (2) the government entity voluntarily assumed a duty to the plaintiff beyond what was owed to the public generally; or (3) the municipality took positive control of a known and dangerous safety condition" (*Ferreira*, 38 NY3d at 334). I believe Laura can pursue her claim under the first and second avenues by which a special duty may be established.

The majority contends that Laura's argument under the first avenue, statutory duty, is unpreserved. I conclude otherwise. The complaint avers that the County (that is, APS and CPS) owed Laura a special duty, which is sufficient to encompass any arguments by which a special duty may be established, including a special duty established by statute. In any event, Plaintiff's Verified Bill of Particulars states that Maldovan, on behalf of Laura's estate "will allege violations of statutes including, but not limited to, the applicable sections of chapter 55 of New York Social Services Law and New York Social Services Law § 473".[9] Section 473 establishes APS's statutory special duty to Laura.

---

[9] Our preservation doctrine is not constitutionally compelled; it is of our own making, and we can draw it as narrowly as we wish. Before the Court's compulsory jurisdiction was curtailed in 1894, we regularly heard argument in more than 800 cases a year. A stingy preservation rule may have made sense then, purely as an ancillary means of docket control; that justification is lacking now. In any event, we have held that:
 "the general rule concerning questions raised neither at the trial nor at previous stages of appeal is far less restrictive than some case language would indicate. Thus, it has been said: "if a conclusive question is presented on appeal, it does not matter that the question is a new one not previously suggested. No party should prevail on appeal, given an unimpeachable showing that he had no case in the trial court." (Cohen & Karger, *op. cit. supra*, pp. 627-628.) Of course, where new contentions could have been obviated or cured by factual showings or legal countersteps, they may not be raised on appeal. But

A

I turn first to the statutory duty argument. APS and CPS are governed by two separate statutes that share similar purposes and impose similar responsibilities upon both agencies. Social Services Law ("SSL") § 473, governing APS, mandates the provision of protective services, which includes investigation of alleged abuse and if necessary, removal of the adult from their home, for all those who "because of mental or physical impairments, are unable to manage their own resources, carry out the activities of daily living, o*r protect themselves from physical abuse, sexual abuse, emotional abuse*, active, passive or self-neglect, financial exploitation or other hazardous situations without assistance from others and *have no one available who is willing and able to assist them responsibly*" (Social Services Law 473 [1] [emphasis added]). Similarly, Social Services Law, Title 6, which established CPS, imposes several duties upon the agency including: receiving and

contentions which could not have been so obviated or cured below may be raised on appeal for the first time (*Telaro v Telaro*, 25 NY2d 433, 439 [1969]; *see also Richardson v Fiedler Roofing, Inc.*, 67 NY2d 246, 251 [1986]; *Wright v Wright*, 226 NY 578 [1919]).

As we have explained, "In our review we are confined to the *questions* raised or argued at the trial but not to the arguments there presented. Nor is it material whether the case was well presented to the court below, in the arguments addressed to it. It was the duty of the judges to ascertain and declare the whole law upon the undisputed facts spread before them; and it is our duty now to give such judgment as they ought to have given'" (*Persky v Bank of Am. N.A.*, 261 NY 212, 218 [1933] [emphasis in original], quoting *Oneida Bank v Ontario Bank*, 21 NY 490, 504 [1860]). We are presented here with a pure question of law – common law, no less, which is our own special duty to develop – on a question that matters greatly to highly vulnerable persons. The question turns on no factual showings and cannot have been affected by legal countersteps: does SSL § 473 establish a statutory special duty? By deferring that question to some unspecified day, we gain nothing, and neither APS nor its clients are benefitted by that prolonged uncertainty.

investigating reports of abuse through the Statewide Central Register of Child Abuse and

Mistreatment; making contact with the suspected abused child in his or her home within

24 hours of receiving a report; and, if denied access to the child or the home, seeking the

help of law enforcement and the courts to gain access to the home and child (Social

Services Law, Title 6, § 424).

Crucially, SSL § 473[3] facially contemplates that APS may be held liable in gross

negligence:

> "Any social services official or his designee authorized or required to
> determine the need for and/or provide or arrange for the provision of
> protective services to adults in accordance with the provision of this section,
> shall have immunity from any civil liability that might otherwise result by
> reason of providing such services, provided such official or his designee was
> acting in the discharge of his duties and within the scope of his employment,
> and that such liability *did not result from the willfull act or gross negligence
> of such official or his designee*" (emphasis added).

SSL § 419 (governing CPS) similarly provides child protective workers with "immunity

from any liability . . . provided that . . . such liability did not result from the willful

misconduct or gross negligence of such person, official or institution."

The language of both statutes makes clear that the legislature immunized APS and

CPS from ordinary negligence only – not from their own gross negligence or willful

misconduct.

To establish a special duty through breach of a statutory duty, the governing statute

must satisfy our three-prong test applicable to implied causes of action (*Pelaez v Seide*, 2

NY3d 186, 201 [2004]; *Sheehy v Big Flats Community Day, Inc.*, 73 NY2d 629 [1989]).[10]

We articulated the implied cause of action test most recently in *Ortiz v Ciox Health LLC*, 37 NY3d 353, 360 [2021]: "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme".

It is undisputed that Laura is among the class of people for whom the statute was enacted. Turning to the other two prongs, in *Ortiz* we explained that the second prong of our implied cause of action test asks "what the Legislature was seeking to accomplish when it enacted the statute, and then determine whether a private right of action would promote that objective" (37 NY3d at 363). The third prong asks whether the legislature had provided other methods of enforcement—which could make recognizing a private right of action inconsistent with the scheme at large (*id* at 364).

The majority points out that in *Mark G. v Sabol*, 93 NY2d 710, 721-722 [1999], we declined to find a private right of action from SSL § 419 (concerning CPS) (maj. op. at 4-5) and so we should follow suit with regard to SSL § 473 and APS.[11] However, this case

---

[10] As set forth in a very long footnote in my dissenting opinion in *Howell v City of New York* (decided today), I believe the test for implying a right of action should not be the same as the test for determining whether a statutory special duty exists. I accept it here because neither party has asked us to reconsider it and the choice of test is immaterial to my analysis.

[11] I pause to note the incongruity of the majority's position that the statutory duty argument is not preserved, and therefore cannot be addressed by us, and its substantive discussion of its merits herein.

is distinguishable from *Mark G.* in one key aspect: the legislative history of SSL § 473, unlike the legislative history of § 419, fully supports the recognition of a private right of action.

Both SSL § 473 and SSL § 419 facially limit the immunity of APS and CPS, respectively, to ordinary negligence only. Of course, where the plain language of a statute is clear, there is no need to look to the legislative history to construe it: we apply it as written unless it produces an absurd result or irreconcilably conflicts with some other statute, neither of which would apply to either SSL § 473 or § 419. However, in evaluating the third prong of the implied right of action test, *Mark G.* relied on the legislative history to overcome the plain language of SSL § 419 and conclude that allowing a private right of action, even for gross negligence or willful misconduct, would compromise a statutory scheme that provided for a different form of enforcement.

The third prong proved problematic for the plaintiff in *Mark G.* because the legislative history showed that the CPS legislative plan "centered on improved monitoring and on penalizing local social services districts with a loss of State reimbursement of funds for their failure to provide services or meet the standards mandated by the statute" (93 NY2d at 720). In enacting SSL § 419, the legislature had provided an enforcement mechanism—financial penalties for the offending districts.

The legislative history of Section 473 is quite different. It contains none of the factors we identified in *Mark G.*[12] Instead, it shows that the legislature charged APS, and APS alone, with the protection of those who had *no one* and could not take care of themselves (Bill Jacket 1975 ch 841 at 22 [emphasis added]). The fact that the legislature expected vulnerable adults to rely on APS to provide them with services and protection is in line with larger national developments in the treatment of disabled and elderly adults at the time that Section 473 was passed. Federal regulations due to become effective in January of 1975 (SSL § 473 was introduced in March of 1975) included no federally mandated services for vulnerable adults, hence the need to mandate services at the state level (Bill Jacket 1975 ch 841 at 13-15). SSL § 473 allowed the State to continue to

---

[12] Although it is not necessary to explain why the liability of APS and CPS workers might be different, the difference may be explainable by the distinction in the State's treatment of vulnerable children as opposed to adults. Children most often reside with parents or foster parents who are responsible for their care. Vulnerable adults often do not; the legislative history of the Social Services Law governing vulnerable adults emphasizes that many of them are completely on their own. In addition, before the wave of deinstitutionalization spurred by changes in federal law and the passage of SSL § 473, the State was held liable in ordinary negligence for failing to properly care for the mentally ill or disabled adults under its supervision and care (*see, e.g.*, *Santana v State*, 266 NYS2d 733, 738 [1966] ["On the evidence before it, the court finds that the failure of the State to provide reasonably adequate care for its ward was the competent producing cause of his death, and that the State must be held liable in damages for this unfortunate event."]; *Harris v State*, 117 AD2d 298, 306 [2d Dept 1986] ["The State's duty herein was to provide Adrienne with a reasonably safe environment given its knowledge of her known propensity for seizures."]; *Patrick v. State of New York*, 806 NYS2d 849, 867 [2005] ["Having entrusted one's child [who was a disabled adult] to the care of others, one hopes that those entrusted do their utmost to earn and retain that trust. Unfortunately, through a series of negligent omissions and acts, the State betrayed that faith"]). It therefore would make sense that when vulnerable adults are removed from State institutions and relegated to the care of APS, APS as the agent of the State that substituted institutional entities, bears some duty towards them, even if not as great as it did while such persons were living in a state-run facility.

deinstitutionalize vulnerable adults (the new federal regulations sought to minimize institutionalization), with APS taking on the mantle of protection previously held by communal homes, hospitals and asylums (*id*. at 15-16). In the legislature's judgment, it was, and continues to be, the State's responsibility to "care for those unable to care for themselves" (*id.* at 7).

Most importantly, the legislative history of the immunity provision governing APS shows that civil liability was the intended enforcement mechanism. The Governor's Approval Memorandum explains that the immunity from civil liability was designed to "aid in the provision of services and to assure that services are provided in a professional and effective manner" (Bill Jacket 1979 ch. 446 at 8). The Budget Report on Bills and the memorandum from the Department of Social Services are to the same effect (*id*. at 9-12; 13-14). Thus, quite unlike the legislative history in *Mark G.*, the legislative history of the immunity provision governing APS demonstrates that the balance struck by that immunity provision -- barring liability for ordinary negligence but preserving it for gross negligence and willful misconduct -- was itself an integral part of the statutory scheme.

Therefore, implying a cause of action here would both promote the legislative purpose and be fully consistent with the scheme. The legislative purpose clear on the statute's face was to immunize APS from claims of ordinary negligence but continue its liability for gross negligence and willful misconduct – which itself *is* the enforcement scheme contemplated by the legislature and Governor. Recognizing a claim would promote the purpose of the statute: ensuring that APS is diligently providing services and

investigating reports of abuse, and compensating those wronged by gross negligence or willful misconduct while immunizing APS from ordinary negligence. A private right of action is not just fully consistent with the legislature's scheme, it *is* the scheme.

B

The creation of a statutory special duty as to APS is so clear here that it hardly seems worth explaining why Laura can also succeed under the second avenue by which a statutory duty can be established: voluntary assumption to a specific person. Keeping in mind the first two of my introductory points – governmental function immunity and the special duty test are common law inventions; and there are myriad situations in which we have held that a plaintiff may prevail in a common-law negligence claim to recover money damages from governmental entities acting in their public capacity – I turn to the reason given by the majority for concluding that Laura cannot recover for the gross negligence of APS and CPS: her failure to demonstrate justifiable reliance (majority op at 5).[13]

---

[13] I concur in the majority's judgment affirming the dismissal of Laura's claims against the Sheriff. Our precedents establish that the police are not held liable in tort when they fail to protect the public at large (*Cuffy v New York*, 69 NY2d 255, 260 [1987]; *Weiner v Metropolitan Transp. Authority*, 55 NY2d 175, 181 [1982]; *Valdez v City of New York*, 18 NY3d 69, 75 [2011]; *see also H.R. Moch Co. v Rensselaer Water Co.*, 247 NY 160, 164 [1928]). The rationale underlying that proposition is that the police are unable to secure the safety of all people at all times, must make discretionary choices about how to allocate limited resources, and are not in the position of an insurer against all evil (*see Cuffy*, 69 NY2d at 75). Here, the Sheriff's alleged liability is premised on a single incident: the deputies were called to the location of runway disabled young woman and returned her home. The Sheriff's duty to protect Laura in that instance was little different from the duty to protect any member of the public at large. Unlike CPS and APS, no statute imposes a duty upon the Sheriff to, in this case, investigate the circumstances of Laura's home life or

Laura satisfies all the *Cuffy* factors: (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.

CPS and APS assumed a duty to act on Laura's behalf when both decided, after receiving reports of abuse, to open an investigation into the family. Investigation is one of the responsibilities imposed on both agencies in the Social Services Law. It is clear from the record that the agencies understood that inaction on their part, if they were wrong, could lead to harm: that is the very calculation these agencies make in deciding to close a case or move to remove a child or adult from a home. They know that if they are wrong in their assessment and close a case, the abuse could continue or worsen. Direct contact is easily satisfied—both CPS and APS visited Laura's home and spoke with her.

The majority's decision to bar Laura's recovery on grounds of insufficient reliance defies both commonsense and caselaw. The majority acknowledges that, in both *Applewhite v Accuhealth, Inc.* (21 NY3d 420, 431 [2013]) and *Sorichetti v City of New York* (65 NY2d 461, 469 [1985]), we modified the common law to permit a relative of the injured party to satisfy the reliance factor set out in *Cuffy*. The majority's declination of the "invitation" to relax the reliance standard for intellectually disabled persons comes with

---

attempt to remove her from an abusive home. There is no evidence that the deputies made any promise or representation to Laura.

only the following explanation: Laura's brother Richard, stationed overseas in the military, caused Justice Stevens to call APS twice, but nothing APS did caused either Richard or Justice Stevens to rely on APS's promises.

1

As to commonsense, "the juristic philosophy of the common law is at bottom the philosophy of pragmatism" (Benjamin N. Cardozo, The Nature of the Judicial Process at 102). What sense does it make to apply a standard of reliance created for persons capable of reliance to someone incapable of reliance? The legislature understood that it would make no sense to do so, which is why its grant of immunity to those working with these specific vulnerable populations – definitionally incapable of self-care – was carefully limited.

The legislative history surrounding the 1979 amendments adding the immunity provisions explain that some measure of immunity from liability was needed to make sure that persons employed to protect these specialized, vulnerable populations be able to perform their responsibilities "in a professional and effective manner", and that institutions hiring workers be able to attract caring and responsible employees (Bill Jacket 1979 ch. 446 at 8). Two important conclusions follow from the legislature's decision that APS and CPS should be liable for the gross negligence or willful misconduct of their employees. *First*, the legislature understood that, without the immunity provided in the amendment, the common law would allow for ordinary negligence actions when against APS and CPS.

*Second*, the legislature chose to strike a balance between the need for quality services and the need to redress wrongs by drawing the line at gross negligence.

Those two points are crucial, each for its own reason. As to the first, we assume the legislature is familiar with our jurisprudence when it acts (*see Transit Commn. v. Long Is. R.R. Co.*, 253 NY 345, 355 [1930]). Whereas many persons with disabilities like Laura's had previously been housed in governmental institutions, the State's policy in 1975, spurred by federal legislation, was to reduce the number of such institutions and, instead, provide protective services in noninstitutional settings (Bill Jacket 1975 ch 841 at 15-16). Under the prior regime, as evidenced by several of our prior decisions referenced earlier herein, such institutions would have been liable to their residents for acts of ordinary negligence. The legislature's conclusion that, but for the statutory grant of limited immunity, APS and CPS would be liable for ordinary negligence, reinforces the understanding that under the common law, the state bore a special duty to such persons, whether physically housed in a state facility or, with the change in policy, supervised in the community. Viewed against the many examples in which we have found negligence claims against governmental actors viable, what does commonsense tell us about Laura's ability to recover for gross negligence, when compared, for example, to an employee of a state institution who slips on cereal?

The second point is even more important: the legislature itself has indicated the way in which the common law should draw the line as to governmental function immunity concerning these vulnerable populations. The majority cannot point to any other

circumstance in which the legislature has done so; none of our special duty cases involve a situation in which the legislature has indicated its choice that a governmental entity be liable under certain standards of care but not others. Had the legislature desired the majority's result here, it would have provided a blanket immunity. It chose not to. I can find no other circumstance in which our Court has "declined the invitation" to render the government liable where the invitation comes from the government itself, in the form of a statute setting out the terms of the government's own liability.

2

As to caselaw, the majority refuses to excuse Laura from the reliance element despite her severe  intellectual disability, even though adapting a standard to the specificities of a particular type of plaintiff is a well-established practice in our common law (*see, e.g.*, *Silverstein v Metropolitan Life Ins. Co.*, 254 NY 81, 85 [1930] ["If a man with an abnormally thin skull be struck a blow which would not seriously injure a normal man, but which causes his death, it is perfectly plain that the cause of death is not the thinness of the skull, but the receipt of the blow"] [internal quotation marks and citation removed]; *Dimino v Burriesci*, 125 AD2d 361, 362 [2d Dept 1986] ["In this instance, where the infant plaintiff was 5 1/2 years old, the court improperly submitted this issue to the jury, and *exacerbated the error by charging an objective standard of care*, i.e., what a reasonably prudent child of the infant plaintiff's age would exercise, *rather than the subjective one correctly employed in evaluating whether a child's conduct constitutes a*

*statutory violation, i.e., what the infant plaintiff is mentally capable of, based on his age,*

*experience, intelligence, and development*" [emphasis added]).

Our function as a common law court is to adapt the law to particular circumstances and current needs.  Instead of attempting to fashion a standard suitable to plaintiffs like Laura, the majority sidesteps that responsibility entirely and chooses, instead, to focus on the reliance of Justice Stevens and Richard Cummings, holding that neither could have relied on CPS/APS because they were told the investigation was closed.  The majority expresses its willingness to reconsider the question of reliance in another case, where the vulnerable adult does not have a "competent adult family member advocating on their behalf" (majority op at 7-8).  That offer gets the reliance analysis backwards.  In *Applewhite* and *Sorchetti*, we modified the common law to allow mothers who sought to protect their children to satisfy *Cuffy*'s reliance standard.  In those cases, we did so as a way of expanding liability.  Here, the majority is using it the opposite way – as if Richard or Justice Stevens had some legal responsibility for Laura or were acting as agents (unbeknownst to her), so that their supposed lack of reliance on APS can be attributed to Laura to negate the existence of a special duty.

For a moment, imagine that the majority would have been willing to eliminate *Cuffy*'s reliance factor for Laura if she had no "competent adult family member advocating on [her] behalf."  Neither Richard nor Justice Stevens had any legal responsibility for Laura; Richard was overseas in the military and Justice Stevens is not a family member at all.  Yet, if we take the majority's future willingness seriously, Laura's claim fails solely

because Richard and Justice Stevens bothered to call APS and CPS. Of course, had they not suspected anything, APS and CPS would not have investigated at all, which also would have spared those agencies liability.

In any event, the facts here present a triable issue as to whether Richard and Justice Stevens relied on promises made by APS. Richard called APS twice, after it had closed the investigation. He insisted that Laura was being abused and had to be taken out of the home—the APS caseworker refused to generate a new intake after each of his calls and told him she had found no evidence of abuse. Justice Stevens also called twice, first CPS, then APS, before he was told the investigation had been closed. A trier of fact could conclude that the findings of no abuse constituted representations on which Richard and/or Justice Stevens could rely, and that APS's instruction that Richard call back if he had new information assured him that APS would investigate properly. If I take my car to an auto mechanic because the brakes seem bad, and the mechanic assures me he has checked thoroughly and the brakes are fine, but then it turns out he never checked the brakes and I crash, haven't I relied to my detriment on that representation?

Essentially, Justice Stevens and Richard may have justifiably trusted CPS and APS' assurances that they found no evidence of abuse. Whether they did so is a triable issue of fact. By bypassing Laura in its analysis and imputing the responsibility to rely to Justice Stevens and Richard, the majority defeats the legislature's intent in enacting Social Services Law § 473—to create an agency, APS, which must help those adults who cannot help themselves and who have no one to assist them. With its decision, the majority

confirms for all adults like Laura what they fear most:  they are alone.  The legislature did

not intend so, and the common law does not require so.

Orders affirmed, with costs. Opinion by Judge Troutman. Acting Chief Judge Cannataro
and Judges Garcia and Singas concur. Judge Wilson dissents in part in an opinion.
Judge Rivera took no part.

Decided November 22, 2022